No.   89-055

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

TERRY ALLEN LANGFORD,

      Defendant and Appellant.



APPEAL FROM:  District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Ted L. Mizner, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

      Michael Donahoe argued; Helena, Montana

      For Respondent:

      Hon. Marc Racicot, Attorney General, Helena, Montana
John Paulson argued, Assistant Attorney General,
Helena, Montana
Christopher G. Miller, Powell County Attorney, Deer
Lodge, Montana


Submitted:  May 2, 1991

Decided:  June 4, 1991

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

On October 12, 1989, this Court remanded this death penalty case to the District Court for the Third Judicial District, Powell County, to permit Terry Allen Langford (Langford) to file a motion to withdraw his guilty pleas regarding two counts of deliberate homicide, two counts of aggravated kidnapping, one count of aggravated burglary, one count of robbery, and one count of theft in connection with the deaths of Edward and Celene Blackwood. Following a hearing on July 16, 1990, the District Court denied Langford's motion. We affirm the District Court's opinion and order, and remand this case with orders to reset the date of execution.

Langford presents the following issues on appeal following remand:

1. Did Langford receive effective assistance of counsel in connection with his decision to plead guilty to the charged crimes?

2. Did the District Court impose the death sentences under the influence of passion, prejudice, or other arbitrary factors by relying in part on victim impact statements and on Langford's failure to display remorse?

3. Did the District Court fail to rule as a matter of law that mitigating factors existed and that such mitigating factors were substantial enough to call for leniency?

4.    Do  Montana's  death  penalty  statutes  violate  Montana  Constitution,  Article  II,  Section  28?

Additionally,  §  46-18-310,  MCA,  mandates  that  this  Court  review  the  following  issues  in  death  penalty  cases:

> The  supreme  court  shall  consider  the  punishment  as  well  as  any  errors  enumerated  by  way  of  appeal.    With  regard  to  the  sentence,  the  court  shall  determine:
>
> (1)    whether  the  sentence  of  death  was  imposed  under  the  influence  of  passion,  prejudice,  or  any  other  arbitrary  factor;
>
> (2)    whether  the  evidence  supports  the  judge's  finding  of  the  existence  or  nonexistence  of  the  aggravating  or  mitigating  circumstances  enumerated  in  46-18-303  and  46-18-304;  and
>
> (3)    whether  the  sentence  of  death  is  excessive  or  disproportionate  to  the  penalty  imposed  in  similar  cases,  considering  both  the  crime  and  the  defendant.    The  court  shall  include  in  its  decision  a  reference  to  those  similar  cases  it  took  into  consideration.

Langford  raises  the  issues  enumerated  in  §§  46-18-310(1)  and  (2),  MCA,  in  this  appeal,  but  does  not  raise  the  issue  enumerated  in  §  46-18-310(3),  MCA.    Therefore,  this  Court  raises  the  following  issue  as  mandated  under  §  46-18-310(3),  MCA:

5.    Did  the  District  Court  excessively  or  disproportionately  impose  the  death  penalty  sentence  in  comparison  to  similar  cases?

3

Facts

On July 5, 1988, Powell County Sheriff David Collings found Edward Blackwood (Edward) and Celene Blackwood (Celene) dead in their home located two miles north of Ovando, Montana. Both victims were found bound in execution-style positions. Edward was found tied to a chair in the living room with his hands tied behind him. He had been shot once in the back of the head with a small caliber handgun. Celene was found lying face down on the couch in the living room with her hands tied to her ankles behind her back. She had been shot in the side of the head with a small caliber handgun and her throat had been slashed with a knife.

In Langford's confession on August 15, 1988, he stated that he "blew two people's brains out" while traveling in Montana about one month earlier; these people were later identified as the Blackwoods. In his confession, Langford offered no reason for his actions. The facts concerning Langford's own actions before, during, and after the crimes are taken directly from his confession and the record in this case.

In late June, 1988, Langford, equipped with his camping gear, traveled by bus to Montana from North Carolina. When he departed from the bus at Ovando, Montana, he proceeded to walk toward a mountainous area. After wandering aimlessly in this area for a period of time, he eventually ended up on the Blackwoods' property. He watched the Blackwoods' movements from a

4

distance before entering and hiding in their garage one evening. While hiding in the garage, he discovered a rifle in the Black-woods' truck with which he armed himself.

When Edward entered the garage the next day, Langford pointed the rifle at him and ordered him to lie down on the floor. He then ordered Edward to call for Celene. When Celene came to the garage, he ordered her also to lie on the floor.

Langford ordered Celene to tie Edward's hands and then ordered them into their home. Once they entered their home, he ordered Edward to sit in a chair and Celene to sit on a couch. He then tied Edward to the chair and tied Celene's feet and hands together behind her back and left her lying on the couch.

While the couple remained tied up, he conversed mainly with Edward for a few hours, asking Edward about his background and if he owned more guns. Edward told him that he owned several handguns, which were located in the bedroom. Langford then retrieved five or six handguns from the bedroom.

Langford later shot Edward and then shot Celene with one of the handguns. Following the shootings, Langford stated that he "got real close and I looked right in [Edward's] eyes" and asked him "Are you dead?" Edward did not reply. At this same time, Langford stated that Celene was "[c]hoking in her own blood. Or so it sounded like. She wouldn't die. I shot her in the side of

the head, but the bitch didn't die." He then slashed Celene's throat.

When he left the Blackwoods' home, he took the money from the Blackwoods' wallets, and he also took a blue athletic bag, which he loaded with several of their possessions including five or six handguns. He then traveled to Great Falls, Montana, in the Blackwoods' blue pickup truck. Police recovered this truck in Great Falls on July 7, 1988. Fingerprints taken from the truck matched those of Langford and accordingly identified him as a suspect.

Langford proceeded by bus to Louisville, Kentucky, and then by taxi to Indiana, where he stayed the night at a motel, later identified as the Star Motel in Jeffersonville. The next morning, he pulled a knife on a maid when she entered his motel room and startled him. Immediately following his encounter with the maid, Langford left the Star Motel with the blue athletic bag containing the handguns, and wandered into a nearby wooded area where he discarded the bag and its contents. He then hitchhiked to Birmingham, Alabama, and later proceeded by bus to Raleigh, North Carolina.

In the meantime, the State of Indiana issued a warrant for Langford's arrest for an alleged July 6, 1988, robbery attempt of the Star Motel. Later, Langford testified at his sentencing hearing that because he needed cash and was attempting robbery,

6

he had intended to kill not only the maid, but also a pizza delivery boy while he was in Indiana. He also testified at his sentencing hearing that in another robbery attempt, he pulled a knife on the taxi cab driver who drove him to Indiana.

Montana authorities had identified and listed the Blackwoods' handguns as stolen on the National Crime Information Computer. Consequently, Montana authorities were notified when the blue athletic bag and handguns therein were discovered on July 27, 1988, in a wooded area 1/4 mile from the Star Motel. One of the weapons in the athletic bag, a High Standard, field king model, .22 caliber, semiautomatic pistol, was later positively identified as the weapon that was used to shoot the Blackwoods. This positive identification was made after an examination by a ballistics expert of the said pistol, the bullets recovered from the Blackwoods' bodies, and the shell casings found at the crime scene.

On August 12, 1988, Langford was arrested in Raleigh, North Carolina, on the Indiana warrant. At the time of his arrest, North Carolina authorities advised him of his Miranda rights. After receiving notice of Langford's arrest from the North Carolina authorities, Powell County Sheriff David Collings and Montana Criminal Investigator Ward McKay traveled to Raleigh on August 13, 1988, to question Langford regarding the Blackwoods' deaths. On August 15, 1988, the two Montana investigators met

with Langford and he agreed to talk with them. After advising Langford of his _Miranda_ rights, Collings and McKay recorded Langford's statement wherein he confessed that he was responsible for the Blackwoods' deaths.

On September 1, 1988, the District Court granted County Attorney Christopher Miller leave to file an information charging Langford with two counts of deliberate homicide; two counts of aggravated kidnapping under § 45-5-303(1)(c), MCA, alternatively charged as two counts of aggravated kidnapping under § 45-5-303(1)(b), MCA; and one count each of aggravated burglary, robbery, and theft. The court appointed C.F. MacKay (MacKay) as counsel for Langford. On September 9, 1988, MacKay moved the court for Langford to be admitted to Montana State Hospital in Warm Springs for a psychiatric evaluation to determine if Langford suffered from a mental disease, disorder or defect. MacKay made this motion based on one remark Langford made to him, which alluded to the possibility that something was wrong with him.

The court granted this motion. Langford remained at Montana State Hospital in Warm Springs for fifty-four days for the completion of a psychiatric evaluation. In the meantime, MacKay continued to meet with Langford on a regular basis to discuss his case and possible defenses. Langford, however, told MacKay that he did not want MacKay to pursue any defenses and desired the death penalty for his crimes if he could not be guaranteed an

8

acquittal or a short prison sentence. The psychiatric evaluation, which was completed on December 13, 1988, stated that Langford suffered from no mental disorder, disease, or defect, which excluded him from responsibility for his crimes or prevented him from appreciating the criminality of his conduct.

On January 5, 1989, Langford entered pleas of guilty as charged by the information to:

> 1) COUNT I: DELIBERATE HOMICIDE - That on or about July 1, 1988, at Ovando, Powell County, Montana, the defendant purposely or knowingly caused the death of Edward Blackwood by shooting Edward Blackwood in the head with a .22 caliber pistol, contrary to the form, force, and effect of Section 45-5-102(1)(a), M.C.A. 1987.

> 2) COUNT II: DELIBERATE HOMICIDE - That on or about July 1, 1988, at Ovando, Powell County, Montana, the defendant purposely or knowingly caused the death of Celene Blackwood by shooting Celene Blackwood in the head with a .22 caliber pistol and by slashing her throat, contrary to the form, force, and effect of Section 45-5-102(1)(a), M.C.A. 1987.

> 3) COUNT III: AGGRAVATED KIDNAPPING - That on or about July, 1, 1988, at Ovando, Powell County, Montana, the defendant knowingly or purposely and without lawful authority restrained Edward Blackwood by using or threatening to use physical force, with the purpose of inflicting bodily injury on or terrorizing Edward Blackwood, by binding Edward Blackwood to a chair and shooting Edward Blackwood in the head with a .22 caliber pistol, contrary to the form, force, and effect of Section 45-5-303(1)(c), M.C.A. 1987.

4) COUNT V: AGGRAVATED KIDNAPPING - That on or about July, 1, 1988[,] at Ovando, Powell County, Montana, the defendant knowingly or purposely and without lawful authority restrained Celene Blackwood by using or threatening to use physical force, with the purpose of inflicting bodily injury on or terrorizing Celene Blackwood, by tying Celene Blackwood's hands to her ankles, shooting Celene Blackwood in the head with a .22 caliber pistol, and slashing Celene Blackwood's throat, contrary to the form, force, and effect of Section 45-5-303(1)(c), M.C.A. 1987.

5) COUNT VII: AGGRAVATED BURGLARY - That on or about July 1, 1988, at Ovando, Powell County, Montana, the defendant knowingly entered or remained unlawfully in the residence of Edward and Celene Blackwood with the purpose to commit the offense of Theft therein and in the course of committing the offense of Theft the defendant purposely or knowingly inflicted bodily injury on Edward and Celene Blackwood, by shooting Edward and Celene Blackwood in the head with a .22 caliber pistol and by slashing Celene Blackwood's throat, contrary to the form, force, and effect of Section 45-6-204(2)(b)[,] M.C.A. 1987.

6) COUNT VIII: ROBBERY - That on or about July 1, 1988, in Ovando, Powell County, Montana, the defendant, in the course of committing the theft of money, guns, and a vehicle from Edward and Celene Blackwood, knowingly inflicted bodily injury upon Edward and Celene Blackwood by shooting Edward and Celene Blackwood in the head with a .22 caliber pistol and slashing Celene Blackwood's throat, contrary to the form, force, and effect of Section 45-5-401(1)(a)[,] M.C.A. 1987.

7) COUNT IX: THEFT - That on or about July 1, 1988, at Ovando, Powell County, Montana, the defendant purposely or knowingly obtained or exerted unauthorized control over the

property of Edward and Celene Blackwood, to wit: seven (7) pistols of various makes and models, cash and wallets, and a 1984 GMC Pickup, Montana License Number 28T-6868, having a value of more than $300.00, with the purpose of depriving the owners of the property, contrary to the form, force, and effect of Section 45-6-301(1)(a), M.C.A. 1987.

The District Court struck Counts IV and VI, the alternative counts of aggravated kidnapping under § 45-5-303(1)(b), MCA. Following Langford's pleas, MacKay made the following statement: "If it please the Court, the Defendant [Langford] requests of this Court that all matters be expedited. The Defendant [Langford] has asked me to advise the Court that he wants the death penalty imposed."

At Langford's sentencing hearing on January 26, 1989, MacKay stated:

As I previously indicated at the last hearing we had, the Defendant [Langford] has asked me to tell the Court that his decision in this case is to ask for the death penalty. He has spent a lot of time with me. He has all of the information that I could give him to make a decision. He is before this Court indicating that he is aware of what his options are. He does not want to spend the rest of his life in prison. He has pled guilty to all of the charges that were leveled against him by the prosecutor, and he asks the Court to impose the death penalty.

At this sentencing hearing, Langford testified that he had no motive or remorse for killing the Blackwoods and would kill again if provoked. Langford also testified that he was satisfied with

11

MacKay's services, he understood the proceedings of the sentencing hearing, and he had no questions regarding the proceedings.

On January 26, 1989, the District Court sentenced Langford to death for each of the two counts of deliberate homicide and the two counts of aggravated kidnapping. The District Court further sentenced Langford to consecutive prison terms of forty years for aggravated burglary, forty years for robbery, ten years for theft, and enhanced his sentence by ten years for using a dangerous weapon in the commission of his crimes. Following the sentencing, MacKay, in keeping with Langford's instructions, filed a notice of intent not to appeal the death penalty sentences.

On July 12, 1989, while this Court was reviewing these death penalty sentences under the automatic review provisions of § 46-18-307, MCA, MacKay notified this Court that Langford had changed his mind and had decided not to seek the death penalty; consequently, MacKay filed a notice of appeal. On August 31, 1989, Langford dismissed MacKay and Michael Donahoe was substituted as his counsel.

On October 12, 1989, this Court remanded this case to the District Court to allow Langford to file a motion to withdraw all his guilty pleas. On remand, the District Court denied Langford's motion in an opinion and order dated July 16, 1990. From this opinion and order, Langford appeals.

12

## Standard of Review

"The granting or refusal of permission to withdraw a plea of guilty and substitute a plea of not guilty rests in the discretion of the District Court and is subject to review only upon a showing of abuse of discretion." State v. Arbgast (1983), 202 Mont. 220, 223, 656 P.2d 828, 830 (citation omitted).

## Analysis

1. Did Langford receive effective assistance of counsel in connection with his decision to plead guilty to the charged crimes?

The State argues that most of Langford's allegations of fact regarding his claim of MacKay's ineffective assistance of counsel are set forth in an affidavit by Langford, which was filed with and supported his motion to withdraw guilty pleas. This affidavit was never admitted into evidence at the hearing. The State argues that because it was never admitted into evidence coupled with the fact that Langford was never examined or cross-examined on its contents at the hearing, the affidavit should not be viewed as evidence by this Court citing, inter alia, a divorce action, Stefonick v. Stefonick (1946), 118 Mont. 528, 167 P.2d 867. We disagree in this instance.

13

Section 26-1-1002, MCA, a statutory provision of evidence, permits the use of an affidavit "to verify a pleading or a paper in a special proceeding. . . ." Section 46-16-201, MCA, provides that "[t]he rules of evidence in civil actions are applicable to criminal actions. . . ." Here, the State never objected to the use of the affidavit at the hearing, and relied on it to secure an order from this Court dated January 9, 1990, which allowed MacKay to testify with immunity. Furthermore, the District Court referenced the affidavit in its opinion and order dated July 16, 1990, that denied Langford's motion to withdraw his guilty pleas. We therefore will consider this affidavit.

Langford argues that when he was arrested in North Carolina, a police officer gave him a pre-printed waiver of rights form containing his <u>Miranda</u> rights for his signature. When the police officer asked him if he wanted to waive his rights, Langford claims that he refused to do so. Langford claims that because of his response, the police officer crossed out words on this form, which indicated that he did not waive his rights. This form, which Langford claims contains the crossed-out words, was not produced during discovery. In January 1990, however, the State obtained this form from the North Carolina State Bureau of Investigation. The form, dated August 12, 1988, has the words "Refused to Sign" written on the signature line, and the form is a

14

part of the record in this case.  The form reads as follows and does not contain any crossed-out material:

360.M.26.1

TYPE CASE: _Fugitive From Justice_     COMPLAINT NO.: _____

DATE: _8/12/88_                        PLACE: _400 E. Six forks_

TIME: _1740_

FILED
MAR 29 1990
MARY ANN McKEE, Clerk
BY_____ Deputy

## Y O U R   R I G H T S

Before we ask you any questions, you must understand your rights:

1. You have the right to remain silent and not make any statements.

2. Anything you say can and will be used against you in court.

3. You have the right to talk to a lawyer for advice before we ask you any questions and to have him or anyone else with you during questioning.

4. If you cannot afford a lawyer, one will be appointed for you by the court, before questioning if you wish.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.

6. If you are a person who has not reached his eighteenth (18th) birthday, is not married, emancipated, or a member of the armed forces, you have a right to have a parent, guardian or custodian present during questioning.

## W A I V E R   O F   R I G H T S

I am willing to make a statement and answer questions, I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me by anyone. I have read or had read to me this statement of my rights and the above waiver of rights and I understand what my rights are.

Signed: _Refused to sign_

IF YOU ARE A HEARING IMPAIRED OR NON-ENGLISH SPEAKING PERSON:

You may have a sign-language or foreign language interpreter present during questioning. If you do not know or cannot afford an interpreter, one will be provided at no expense to you.  If you understand all of your rights, please write on the line immediately below, "I have read and understand each of my rights."

_____

Signed: _____

Witness: _R. Suus  NCSBI_

Witness: _M. Hurt, RPD_

Witness: _____

DEFENDANT'S EXHIBIT

15

On August 15, 1988, Montana authorities also advised Langford of his <u>Miranda</u> rights prior to interviewing him. After being advised of his rights, Langford signed a waiver of rights form. He then voluntarily confessed that he killed the Blackwoods. The signed August 15, 1988, waiver of rights form reads as follows:

Terry Allen LANGFORD
DOB/ 051866
SOC/ 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

YOUR RIGHTS

FILED

MAR 29 1990

MARY ANN McKEE, Clerk
BY _____ Deputy

Place _Raleigh N.C. Police Dept._

Date _8/15/88_

Time _1112 hrs_

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can and will be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, the court will appoint one for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time.

WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions without an attorney present. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed _Terry A. Langford_

WITNESS _Ward J. McKay_
WITNESS _____
TIME _1112 hrs_

DEFENDANT'S
EXHIBIT
_A_

16

Langford argues that because he refused to waive his rights to the North Carolina authorities, he was entitled to and was denied an attorney immediately following his arrest and before his confession. Langford argues that MacKay failed to provide effective counseling because MacKay never informed Langford that he had this defense argument, which possibly could have resulted in the suppression of his confession. Langford argues that because he refused to waive his <u>Miranda</u> rights to the North Carolina authorities, his waiver of rights prior to his confession to Montana authorities is void. Langford further argues that MacKay failed to provide effective counsel because MacKay never obtained this form with the alleged crossed-out words during discovery.

Additionally, Langford argues that MacKay failed to adequately discuss with Langford the events of the crimes, his arrest, his confession, or his intent to plead guilty and request the death penalty. Langford argues that MacKay failed to adequately explore the potential defenses of 1) the denial of a prompt initial appearance before a court and 2) possible constitutional violations attached to Langford's voluntary confession. Lastly, Langford argues that MacKay did not advise him on the controlling law concerning the appointment of a defense psychiatrist to assist him in the evaluation of his defense. Langford's arguments lack merit.

17

Before analyzing Langford's arguments, we wish to note MacKay's qualifications. MacKay has been a full-time public defender for the Third Judicial District for ten years and has practiced law since 1955. He has represented criminal defendants in nearly 1000 felony cases, some of which involved homicide and other major felonies. Additionally, he has attended continuing education seminars on the death penalty.

Langford's arguments of ineffective counsel fail because Langford cannot satisfy the tests under Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and Hill v. Lockhart (1985), 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203. The test in Strickland provides that to prove a claim of ineffective counsel, "a defendant must show that counsel's performance was deficient" and because of this deficiency, the defendant was denied a fair trial. Strickland, 466 U.S. at 687. The test in Hill provides that when a guilty plea is involved, the defendant must show that but for counsel's deficient performance, the defendant would not have pled guilty "and would have insisted on going to trial." Hill, 474 U.S. at 59 (footnote omitted). Accord State v. Senn (Mont. 1990), 795 P.2d 973, 47 St.Rep. 1389.

This Court has observed that "'[c]laimed inadequacy of counsel must not be tested by a greater sophistication of appellate counsel, nor by that counsel's unrivaled opportunity to study the record at leisure and cite different tactics of perhaps doubtful

18

efficacy.'" State v. Martz (1988), 233 Mont. 136, 140, 760 P.2d 65, 68 (citations omitted). "Judicial scrutiny of counsel's performance must be highly deferential" and "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. The reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." Strickland, 466 U.S. at 689.

Here, the record establishes that MacKay's performance was not deficient in the areas raised by Langford. Regarding the unsigned waiver of rights form, "refusing to sign a waiver of rights form without an attorney's guidance is not synonymous with an affirmative request for assistance of counsel." United States v. Eirin (11th Cir. 1985), 778 F.2d 722, 728. See also United States v. McKinney (5th Cir. 1985), 758 F.2d 1036, 1045 (defendant's refusal to sign a waiver of rights form did not automatically render further questioning illegal). Accordingly, even if MacKay would have requested this form during discovery, the form would not have constituted a viable defense for Langford.

Furthermore, no evidence exists in the record to prove that Langford even told MacKay that he had refused to sign a waiver of rights form with the North Carolina arresting officers or that

19

Langford had said anything to the arresting officers that might be viewed as an invocation of his right to counsel. This indicates that MacKay was unaware of the North Carolina form's hand-written statement "Refused to Sign." An attorney has no duty to investigate leads that do not appear to be fruitful. Harvey v. United States (8th Cir. 1988), 850 F.2d 388, 403. See also Roach v. Martin (4th Cir. 1985), 757 F.2d 1463, 1476, n. 19, cert. denied, 474 U.S. 865 (1985) (trial counsel was not ineffective for failing to interview a police officer about the arrest where counsel made an appropriate investigation based on information supplied by the defendant concerning statements to the police).

The record, through MacKay's testimony, does indicate that MacKay discussed the circumstances of the arrest during one of his first conferences with Langford and learned that Langford had been advised of his Miranda rights by North Carolina authorities and that he understood these rights. Moreover, the record indicates that before Langford gave his confession, he was once again read his Miranda rights, this time by Montana authorities, and signed a waiver of rights form. We therefore see no deficiency with regard to MacKay's performance regarding the unsigned waiver form.

Regarding Langford's arguments that MacKay failed to adequately discuss with Langford the events of the crimes, his arrest, his confession, or his intent to plead guilty and request

20

the death penalty, the record again indicates that MacKay's performance in these areas was not deficient. The record contains substantial evidence proving that MacKay provided effective counseling to Langford, including MacKay's testimony concerning his time and effort devoted to: 1) interviewing Langford, 2) obtaining the State's full investigative file at that time, 3) investigating the facts and legal strategies, and 4) informing Langford of his legal options.

Furthermore, it is important to note that MacKay was required to abide by Langford's decisions, which were, at the time, to plead guilty to all charges and to request the death penalty. See Montana Rules of Professional Conduct, Rule 1.2, (adopted by this Court on June 6, 1985). MacKay testified that Langford solely determined these decisions, and that he attempted on at least two occasions to persuade Langford to reconsider while also advising him of the gravity of those decisions. Moreover, Langford stated on numerous occasions to MacKay that he desired the death penalty for his crimes. Furthermore, he stated to the District Court that he fully understood the proceedings of his sentencing hearing. Langford's change of mind concerning his guilty pleas and having the death penalty imposed against him does not mean that MacKay's performance was deficient at a time when Langford had an opposite mind-set.

21

Additionally, Langford argues that MacKay failed to adequately explore the possible defenses of 1) the denial of a prompt initial appearance before a court and 2) possible constitutional violations attached to Langford's voluntary confession. Even if these were possible defenses in this case, the record does not support allegations that MacKay failed to explore these defenses. The record does indicate that MacKay adequately investigated the possibility of filing a motion to suppress Langford's confession and challenging Montana's death penalty statutes. Langford, however, told MacKay that unless MacKay could guarantee him acquittal on the charges pending against him or could assure him that he would spend little time in prison, he wanted to plead guilty and be executed. MacKay told Langford that neither he nor any other responsible attorney could make that kind of guarantee. Langford then repeatedly instructed MacKay not to file any suppression motions or initiate any further investigation on his behalf. MacKay eventually abided by Langford's decisions and exhibited no deficiency in his performance by doing so.

Lastly, Langford argues that MacKay did not advise him on the controlling law, namely Ake v. Oklahoma (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53, concerning the appointment of a defense psychiatrist to assist him in the evaluation of his defense. Langford argues that he would not have pled guilty if he

had known about the possibility of obtaining the services of another court-appointed psychiatrist.

In Ake, the Court held that when a defendant has made a preliminary showing that his sanity at the time of the offense is to be a significant factor at trial, the State must assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. Ake, 470 U.S. at 82. The Court in Ake also noted, however, that a defendant's mental condition is not necessarily at issue in every criminal proceeding and that the mental condition must be seriously in question before the right is implicated. Ake, 470 U.S. at 82-83.

At no time did Langford put his mental state at issue at the time of his commission of the crimes, prior to or at the time of his guilty pleas, or at his sentencing. Langford spent fifty-four days at Montana State Hospital in Warm Springs for a court-ordered psychiatric evaluation based upon a single remark he made to MacKay during one of his first interviews. Langford's remark alluded to the possibility that something was wrong with him.

The Montana State Hospital psychiatric evaluation concluded, inter alia, that Langford suffered from no mental disease, disorder, or defect, which excluded responsibility for the crimes or prevented Langford from appreciating the criminality of his acts. The record is void of evidence that this evaluation was inac-

curate. In fact, Langford testified at his sentencing hearing that he believed the evaluation was accurate.

Additionally, the record does not indicate that a second evaluation was warranted; it is void of evidence that Langford displayed any bizarre behavior or made any remarks that indicated a need for further evaluation. Furthermore, there is nothing in the record to indicate that a second evaluation would have made a difference in Langford's pleas based on Langford's firm stand to enter guilty pleas at the time. We emphasize that Langford repeatedly told MacKay that he did not want him to do anything on his behalf if Langford could not be guaranteed of an acquittal or, in the alternative, a short prison term for his crimes. MacKay's performance was not deficient in this area. We therefore hold that MacKay provided Langford with effective assistance of counsel.


2. Did the District Court impose the death sentences under the influence of passion, prejudice, or other arbitrary factors by relying in part on victim impact statements and on Langford's failure to display remorse?

Section 46-18-310(1), MCA, mandates this Court in death penalty cases to review: "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. . . ." A review of this issue as well as

Issues Three and Five of this appeal "serves as a check against the random or arbitrary imposition of the death penalty." Gregg v. Georgia (1976), 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859, 893.

Here, the evidence fails to indicate that the District Court judge imposed the death penalty under any such arbitrary influence. The record does not reflect that any public opinion or media, any personal bias or prejudice, any fear of community objection, or any other type of improper circumstances affected the court's sentencing decision. Compare State v. Keith (1988), 231 Mont. 214, 754 P.2d 474 (holding that allegations of any such prejudice are speculative without any supporting evidence).

Langford did not object to the District Court's consideration of the pre-sentence report at his sentencing hearing. The pre-sentence report, which stated that a life sentence would be a harsher penalty than the death penalty for Langford, contains nothing notably inaccurate or inflammatory. The court's written findings and conclusions are careful and dispassionate. After examining the numerous letters written in regard to the case, most non-supportive and one supportive of Langford, the court stated only that it is "ever mindful of the pain, suffering and fear of the victims in this case as well as that of their family, friends and the community."

Langford cites Booth v. Maryland (1987) 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, which held that the jury's consideration of a victim impact statement violated the Eighth Amendment, by creating an unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner. Booth can be distinguished from the facts herein because: 1) in Booth, Maryland's then statutory scheme differs from Montana's by requiring the consideration of victim impact statements if a victim suffered injury or death, and 2) in Montana, a judge, rather than a jury, sentences the defendant. Accord State v. Kills On Top (Vern) (1990), 243 Mont. 56, 793 P.2d 1273; State v. Kills On Top (Lester) (1990), 241 Mont. 378, 787 P.2d 336; State v. Dawson (1988), 233 Mont. 345, 761 P.2d 352; State v. Keith (1988), 231 Mont. 214, 754 P.2d 474.

Additionally, Langford argues that the District Court improperly relied upon Langford's lack of remorse, treating his absence of contrition as an aggravating circumstance. This allegation appears to be based upon the District Court's observation at the sentencing hearing that Langford showed no signs of remorse for his crimes.

The record and the court's findings, however, clearly show that the District Court did not treat Langford's lack of remorse as an aggravating circumstance or shift the burden to Langford. The court mentioned lack of remorse as part of the court's gener-

26

al discussion of possible mitigating circumstances and not in connection with the court's earlier discussion of the aggravating circumstances in the case. Accordingly, the court properly viewed Langford's lack of remorse as evidence of the absence of mitigating factors sufficiently substantial to call for leniency. See State v. Kills On Top (Vern), supra; State v. Kills On Top (Lester), supra; State v. Dawson, supra.

Even if the court had viewed Langford's lack of remorse as an aggravating factor, it would have committed no error because, while lack of remorse is not statutorily enumerated as an aggravating circumstance, it still relates to the propriety of the death sentence. State v. Kills On Top (Lester), 241 Mont. at 404, 787 P.2d at 353 (citation omitted). Because Langford has not alleged, and the record fails to indicate, any improper sentencing influence, we conclude that the District Court did not impose the death sentence under the influence of passion, prejudice or any other arbitrary factor.


3. Did the District Court fail to rule as a matter of law that mitigating factors existed and that such mitigating factors were substantial enough to call for leniency?

This issue concerns "whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in [§§] 46-18-303 and

46-18-304[,] [MCA]. . . ." Section 46-18-310(2), MCA. The District Court may impose a sentence of death if it finds the existence of one or more of the aggravating circumstances listed in § 46-18-303, MCA, and if it determines that none of the mitigating circumstances listed in § 46-18-304, MCA, are "sufficiently substantial to call for leniency." Section 46-18-305, MCA.

Langford argues that the District Court failed to consider the following mitigating factors as stated in the pre-sentence report and state hospital report, which call for leniency: 1) Langford's past drug use, 2) Langford's troubled childhood centering around his hostility toward his mother, 3) Langford's habit of characterizing himself in an unfavorable light, and 4) an evaluator's opinion that Langford may be suicidal.

The State argues that the District Court did examine mitigating factors and found that there were none substantial enough to call for leniency. Furthermore, the State argues that the District Court adequately disclosed the basis of its sentences in its findings and conclusions. We agree with the State's arguments.

The District Court in this case expressly found the existence of two aggravating circumstances. First, the court noted that the two homicides were committed as part of a scheme which resulted in the death of more than one individual. See § 46-18-303(5), MCA. As used in this statute, the word "scheme" means a

28

"planned undertaking" or a "systematic plan." See Webster's Third New International Dictionary 2027 (16th ed. 1971). This interpretation comports with the interchangeable usage at law of the terms "scheme," "plan" and "system." See generally State v. Keefe (1988), 232 Mont. 258, 759 P.2d 128 (requiring, inter alia, proof of a "common scheme, plan or system" prior to the admissibility of evidence of other crimes).

Langford's actions portray just such a systematic criminal plan which, when completed, ended in the deaths of the Blackwoods. Langford's actions included observing the house over a period of several days, subduing Edward by use of a rifle when he walked into the garage one morning, waiting for Celene to appear and then requiring her to tie Edward's wrists with rope, ordering the Blackwoods into their home before similarly tying Celene's wrists and ankles and tying Edward to a chair, requesting the location of those weapons belonging to the Blackwoods before finally, after the passing of several hours, shooting both in the head and slashing Celene's throat when the shot failed to kill her, and then fleeing with the Blackwoods' pickup, weapons, and money.

Second, the court noted that Langford committed aggravated kidnapping which resulted in the death of the victims. See § 46-18-303(7), MCA. An individual commits the offense of aggravated kidnapping when he or she:

29

> knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation or by using or threatening to use physical force, with any of the following purposes:
>
> . . .
>
> (b) to facilitate commission of any felony or flight thereafter;
>
> (c) to inflict bodily injury on or to terrorize the victim or another . . . .

Section 45-5-303(1), MCA. The evidence clearly indicates that Langford in fact knowingly and forcibly restrained the Blackwoods in the living room of their house by the use of ropes and threats at gunpoint. We hold that this detention, which facilitated Langford's murder of the Blackwoods and robbery of their pickup truck, weapons and money, was sufficient to constitute aggravated kidnapping.

The court found no mitigating circumstances existed except Langford's lack of an extensive documented prior criminal record. The evidence supports the court's findings regarding mitigating circumstances. Nothing indicated that Langford was under the influence of extreme mental or emotional disturbance, that he was under extreme duress or the substantial domination of another person, that he was mentally incapacitated, that the victims participated in or consented to his actions, or that Langford was

30

merely an accomplice or under the age of eighteen at the time the Blackwoods were killed in July of 1988. See § 46-18-304, MCA.

To the contrary, Langford was on a camping trip, without any human contact whatsoever for several days prior to the incident. Langford stated, as did the psychiatric report, that he was not under any extreme mental or emotional disturbance at the time, and that he was capable of appreciating the criminality of his conduct and conforming his conduct according to the law. The fact that the Blackwoods were bound eliminates the possibility that they could exert any substantial domination over Langford just prior to or at the time of their deaths or that they could participate in any way in the homicides. No evidence exists showing that another person was involved in the homicides and Langford himself contends he alone is responsible for the Black-woods' homicides. Lastly, Langford stated he had not taken any drugs or alcohol at the time of the homicides.

The only potentially mitigating circumstance noted by the court involved Langford's lack of an extensive documented prior criminal record. Langford had previously been convicted of two felony counts of forgery and tampering with a vehicle. However, the court held, and we think rightly so, that this lack of an extensive criminal record was not sufficiently substantial to merit leniency. This Court has previously held that a defendant's lack of prior violent criminal activity does not neces-

sarily require sentence leniency. <u>See</u> State v. Keith (1988), 231 Mont. 214, 754 P.2d 474; State v. Smith (1985), 217 Mont. 461, 705 P.2d 1087, <u>cert. denied</u>, 474 U.S. 1073 (1986), <u>habeas corpus conditionally granted</u>, 914 F.2d 1153 (9th Cir. 1990); State v. Dawson (1988), 233 Mont. 345, 761 P.2d 352. In light of the facts regarding these two homicides, Langford's statement that he considered killing two other people after the Blackwoods' homicides, and his statement that he would kill again if provoked, we hold that the District Court did not err in holding that lack of an extensive, violent criminal record was not sufficiently substantial to merit leniency.

4. Do Montana's death penalty statutes violate Montana Constitution, Article II, Section 28?

The State asserts that because Langford failed to 1) object during the district court proceedings concerning the constitutionality of the death penalty statutes and 2) develop this argument in the district court record, he is now banned from raising this constitutional challenge on appeal. We disagree. Because this case involves death penalty sentences, we will consider this constitutional issue on appeal.

Langford argues that Montana's death penalty statutes violate Article II, Section 28 of Montana's Constitution, which provides:

> Laws for the punishment of crime shall be founded on the principles of prevention and reformation. Full rights are restored by termination of state supervision for any offense against the state.

This Court previously examined this issue and upheld Montana's death penalty statutes in State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023, vacated on other grounds, 433 U.S. 905 (1977), on remand, 177 Mont. 280, 581 P.2d 1205 (1978), vacated, 443 U.S. 903 (1979), on remand, 186 Mont. 481, 608 P.2d 428 (1980), cert. denied, 449 U.S. 1050 (1980), vacated in part on other grounds, 842 F.2d 1525 (9th Cir. 1988), cert. denied, 488 U.S. 901 (1988):

> Here, defendant argues that Article II, Section 28, 1972 Montana Constitution no longer expressly authorizes the legislature to provide for the death penalty as did Article III, Section 24, 1889 Montana Constitution. The failure to reenact the authorization might have significance had not the Constitutional Convention given the people of Montana the option of adopting into the 1972 Constitution language expressly prohibiting the enactment of the death penalty. The people of Montana voted for 147,023 and against 77,733, to retain the death penalty. Such a vote, so recently, negates any argument the death penalty violates contemporary standards of decency.

McKenzie, 171 Mont. at 294, 557 P.2d at 1033.

Langford recognizes this language from the case of McKenzie in his brief, but argues that the June 6, 1972 vote concerning the death penalty was illegal because the 1972 Constitutional

33

Convention exceeded its authority when it placed the death penalty issue before the voters as a "side issue" along with the 1972 Montana Constitution, citing State ex rel. Cashmore v. Anderson (1972), 160 Mont. 175, 500 P.2d 921, cert. denied, 410 U.S. 931 (1972). Furthermore, Langford argues that the 1972 vote on the issue was inconclusive, and that the voter information pamphlet was confusing. Langford's arguments lack merit.

Langford's reliance on Cashmore is misplaced and he cites no applicable authority in support of his theory. The issue in Cashmore was whether the 1972 Montana Constitution was approved by a majority of the voters, and not whether the Constitutional Convention exceeded its authority by placing three alternative issues on the ballot along with the 1972 Montana Constitution. Furthermore, we do not believe the 1972 vote was either illegal or inconclusive, nor do we believe the voter information pamphlet was confusing. To the contrary, the people of Montana, through the 1972 vote, clearly displayed their desire to retain the death penalty by a near two-to-one margin. We therefore affirm our holding in McKenzie and hold that Montana's death penalty statutes do not violate Montana Constitution Article II, Section 28.

5. Did the District Court excessively or disproportionately impose the death penalty sentence in comparison to similar cases?

34

Although Langford does not raise this issue on appeal, this Court is charged with determining whether the death sentence imposed in any given case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Section 46-18-310(3), MCA. This determination entails a comparison of all the following cases appealed to this Court, which involved similar crimes for which the death penalty was or could have been imposed: State v. Kills On Top (Vern) (1990), 243 Mont. 56, 793 P.2d 1273; State v. Kills On Top (Lester) (1990), 241 Mont. 378, 787 P.2d 336; State v. Dawson (1988), 233 Mont. 345, 761 P.2d 352; State v. Keefe (1988), 232 Mont. 258, 759 P.2d 128; State v. Keith (1988), 231 Mont. 214, 754 P.2d 474; State v. Smith (1985), 217 Mont. 461, 705 P.2d 1087, cert. denied, 474 U.S. 1073 (1986), habeas corpus conditionally granted, 914 F.2d 1153 (9th Cir. 1990); State v. Fitzpatrick (1977), 174 Mont. 174, 569 P.2d 383, on remand, 186 Mont. 187, 606 P.2d 1343 (1980), cert. denied, 449 U.S. 891 (1980), rev'd on other grounds, 869 F.2d 1247 (9th Cir. 1989), cert. denied, 110 S.Ct. 203 (1989); State v. Coleman (1978), 177 Mont. 1, 579 P.2d 732, on remand, 185 Mont. 299, 605 P.2d 1000 (1979), cert. denied, 446 U.S. 970 (1980), rev'd on other grounds, 874 F.2d 1280 (9th Cir. 1989), cert. denied, 110 S.Ct. 349 (1989); State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023, vacated on other grounds, 433 U.S. 905 (1977), on remand, 177 Mont. 280,

581 P.2d 1205 (1978), vacated, 443 U.S. 903 (1979), on remand, 186 Mont. 481, 608 P.2d 428 (1980), cert. denied, 449 U.S. 1050 (1980), vacated in part on other grounds, 842 F.2d 1525 (9th Cir. 1988), cert. denied, 488 U.S. 901 (1988).

After examination of such factors as the gravity of the offenses, the facts relating to the commission of the offenses, and the non-existence of any factors meriting leniency, we hold that the sentence was not disproportionate or excessive to others imposed in similar cases. All the above-cited cases, except Keefe, involved a death penalty imposed for the aggravated kidnapping and subsequent homicide of a victim. So too does this case. Moreover, this case involves not just one, but multiple homicides, as did the cases of Dawson and Smith. As in the case of Fitzpatrick, the victims were shot in the head, execution-style, after having been bound. Further, the factor meriting leniency in the Keefe case, namely, the fact Keefe was under the age of eighteen at the time he committed the three homicides, does not exist in this case. Langford was twenty-two years of age at the time he committed the charged crimes.

In conclusion, after reviewing all the evidence and applicable law, we hold that the District Court did not abuse its discretion in denying Terry Allen Langford's motion to withdraw guilty pleas and we affirm the sentences imposed by the District Court on January 26, 1989. This case is remanded to the District

36

Court with orders to set a new date of execution of the death sentences imposed upon Terry Allen Langford.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices

37