Nos. 95-477 and 95-494

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

      Plaintiff and Respondent,

  v̈.

RONALD ALLEN SMITH,

      Defendant and Appellant.

FILED

DEC 13 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable John W. Larson, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          Gregory A. Jackson, Jackson & Rice, Helena, Montana

          Donald Vernay, Big Fork, Montana

      For Respondent:

          Hon. Joseph P. Mazurek, Attorney General; Elizabeth
Griffing, Assistant Attorney General, Helena,
Montana

          Thomas Esch, County Attorney, Kalispell, Montana


                    Heard:    October 29, 1996
          Submitted:    November 7, 1996
            Decided:    December 13, 1996

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Ronald Allen Smith appeals from the September 19, 1995 judgment of the Eleventh Judicial District Court, Flathead County, ordering that he be executed according to the laws of the State of Montana. His appeal is here consolidated with this Court's automatic review of a death penalty case. We affirm.

The issues are:

1. Is the sentence imposed the result of vindictive prosecution by the State of Montana?

2. Is Montana's death penalty statutory scheme unconstitutional in its allocation of the burdens of proof of aggravating and mitigating circumstances?

3. Are the court's findings of the existence or nonexistence of aggravating and mitigating circumstances supported by the evidence?

4. Did the court erroneously rely upon the reports and testimony of Dr. Stratford in reaching its decision, and, if it did so rely, did such reliance violate Smith's right against self-incrimination, right to counsel, and right to due process?

5. Did the court err by excluding mitigating evidence from consideration?

6. Does the § 46-18-310(3), MCA, requirement that this Court undertake a proportionality review deny a capital defendant due process of law?

7. Is the sentence imposed disproportionate to the penalty imposed in similar cases?

8. Was the sentence imposed by the court under the influence of passion, prejudice, or any other arbitrary factor?

9. Was Smith's right to due process or his right to be free from cruel and unusual punishment violated by resentencing him to death, because of the amount of time he has spent on death row and the number of sentencing hearings held in this case?

This appeal and automatic review of a death sentence follow the 1995 sentencing of Ronald Allen Smith for his participation in the 1982 kidnappings and deliberate homicides of Thomas Running Rabbit, Jr., age 20, and Harvey Mad Man, Jr., age 23. The factual background of these offenses is set forth in State v. Smith (1985), 217 Mont. 461, 705 P.2d 1087 (Smith I), and will be detailed more fully as necessary in the discussion of the issues below.

Smith was originally sentenced to death in 1983 after he pled guilty to two counts of aggravated kidnapping and two counts of deliberate homicide. At that time, he requested the death penalty, stating that he had killed the victims to obtain their car and because he wanted "to find out what it would be like to kill somebody." In Smith I, this Court affirmed the death sentences.

However, in 1990, the Ninth Circuit Court of Appeals conditionally granted Smith's petition for habeas corpus. Smith v. McCormick (9th Cir. 1990), 914 F.2d 1153. The court remanded with instructions directing the District Court to appoint a defense psychiatrist for Smith and to weigh the mitigating evidence in its totality against the aggravating circumstances.

The District Court conducted proceedings to comply with the Ninth Circuit Court's instructions and subsequently resentenced Smith to death on March 13, 1992. This Court reversed that judgment in State v. Smith (1993), 261 Mont. 419, 863 P.2d 1000 (Smith II). The Smith II Court remanded with directions that a new presentence investigation report must be prepared and, in resentencing, a different district judge must consider Smith's conduct while incarcerated as a mitigating circumstance.

On remand, a different district judge assumed jurisdiction. He appointed Smith a new sentencing consultant, a new psychologist, and a new pharmacological consultant. All three of those experts testified for Smith at the May 1995 sentencing hearing. At the hearing, Smith further presented his own testimony and that of a psychiatric social worker; his accomplices; his teacher at Montana State Prison; and video testimony of his sister, his daughter, and a Smith family friend.

The State called as a witness at the 1995 sentencing hearing the author of the extensive presentence investigation report prepared for that sentencing. The State also called, as victim impact witnesses, members of the victims' families. Following the three-day hearing, Smith was sentenced to death on September 19, 1995.

ISSUE 1

Is the sentence imposed the result of vindictive prosecution by the State of Montana?

4

This argument derives from the plea agreement offered to Smith in February 1983. The plea offer proposed a sentence of 110 years, with no parole restrictions and the State's promise to support Smith's motion to withdraw his plea if the court imposed the death penalty. In exchange, Smith was to enter guilty pleas to two counts of deliberate homicide, escape, and aggravated kidnapping (the last two charges arising from his escape from Flathead County Jail in January 1983).

Smith rejected the plea offer, stating that he wished to force the county to spend some of its money. Twenty-two days later, though, he gave notice of his intent to plead guilty to all counts in the original information filed against him and to seek the death penalty. Smith now contends that the State has since requested the death penalty as retaliation for his exercise of his free speech right when he rejected the plea offer.

Confronting a defendant with the risk of more severe punishment following the rejection of a plea bargain cannot form the basis for a claim of prosecutorial vindictiveness. Bordenkircher v. Hayes (1978), 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604. Allowing such a claim would contradict the premises that underlie the accepted practice of plea bargaining. Once Smith rejected the plea offer in 1983, the State's obligation to honor the offered plea agreement ended.

Furthermore, contrary to Smith's assertions and in contrast to the case he has cited, Adamson v. Ricketts (9th Cir. 1988), 865 F.2d 1011, the record in this case establishes that the prosecution

5

discovered additional facts concerning Smith's offenses after it extended the plea offer. In a 1992 deposition prepared for an evidentiary hearing in federal court, a copy of which is attached to District Court document no. 158, the prosecuting attorney made the following statements regarding the 1983 plea offer to Smith:

> Q. From your recollection, did you ever withdraw the offer that's referred to in the letter?
>
> A. I didn't have to. He refused the offer. I need to say that part of the motivation or consideration on **my** part for the offer was that at that point I had not nearly as much information about what transpired up there by Essex that I later came to have, obviously, and I did --I was motivated to make the offer because I was lacking in a lot of evidence as to exactly what took place in the murder of those two boys, who did exactly what. I didn't have to withdraw it because I received word back from [Smith's defense counsel] that it was refused, and then my recollection is that initially it was refused and that his client was going to maintain his not guilty plea and proceed to trial, and **ultimately** he changed his mind and pled.

The prosecutor further acknowledged at that evidentiary hearing that "until [Smith] entered his guilty plea and testified himself as to the circumstances, there were some things about what took place up there, you're right, that I didn't know."

We hold that Smith has not established vindictive prosecution in this case.

ISSUE 2

Is Montana's death penalty statutory scheme unconstitutional in its allocation of the burdens of proof of aggravating and mitigating circumstances?

Section 46-18-301, MCA, provides that when a defendant is found guilty of or pleads guilty to an offense for which a sentence

6

of death may be imposed, the presiding judge shall conduct a separate sentencing hearing to determine the existence or nonexistence of aggravating and mitigating circumstances.

Aggravating circumstances are any of the following:

(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

(3) The offense was deliberate homicide and was committed by means of torture.

(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.

(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

(6) The offense was deliberate homicide as defined in subsection (1)(a) of 45-s-102, and the victim was a peace officer killed while performing his duty.

(7) The offense was aggravated kidnapping which resulted in the death of the victim or the death by direct action of the defendant of a person who rescued or attempted to rescue the victim.

(8) The offense was attempted deliberate homicide, aggravated assault, or aggravated kidnapping committed while incarcerated at the state prison by a person who has been previously:

(a) convicted of the offense of deliberate homicide; or

(b) found to be a persistent felony offender pursuant to part 5 of this chapter and one of the convictions was for an offense against the person in violation of Title 45, chapter 5, for which the minimum prison term is not less than 2 years.

(9) The offense was deliberate homicide and was committed by a person during the course of committing sexual assault, sexual intercourse without consent, deviate sexual conduct, or incest, and the victim was less than 18 years of age.

Section 46-18-303, MCA.

Mitigating circumstances are any of the following:

(1)(a) The defendant has no significant history of prior criminal activity.

7

(b) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
(c) The defendant acted under extreme duress or under the substantial domination of another person.
(d) The capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform the defendant's conduct to the requirements of law was substantially impaired.
(e) The victim was a participant in the defendant's conduct or consented to the act.
(f) The defendant was an accomplice in an offense committedby another person, and the defendant's participation was relatively minor.
(g) The defendant, at the time of the commission of the crime, was less than 18 years of age.
(2) The court may consider any other fact that exists in mitigation of the penalty.

Section 46-18-304, MCA.

The sentencing court must take into account the aggravating and mitigating circumstances enumerated above

and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency.

Section 46-18-305, MCA. When a death sentence is imposed, the court must make specific written findings as to the existence or nonexistence of each aggravating or mitigating circumstance set forth in §§ 46-18-303 and -304, MCA. The written findings must be substantiated by the records of the trial and the sentencing proceeding. Section 46-18-306, MCA.

Smith argues that Montana's statutory scheme concerning aggravating and mitigating circumstances is too vague to provide guidance to the sentencing judge. He asserts that the absence of specific burdens of proof or persuasion renders appellate review meaningless. He maintains that in order to impose a sentence of

8

death, the aggravating circumstances must outweigh the mitigating circumstances beyond a reasonable doubt.

Smith has previously challenged Montana's death penalty statutes as failing to properly define a burden of proof in Smith II. In that case, this Court recognized that § 46-18-305, MCA, places the burden of proving mitigating circumstances upon the defendant and ruled that this allocation of the burden of proof is "constitutionally sound." Smith II, 863 P.2d at 1011, citing Fitzpatrick v. State (1981), 194 Mont. 310, 328, 638 P.2d 1002, 1013. The Court noted that the United States Supreme Court has similarly held that a defendant's constitutional rights are not infringed by placing the burden of proving mitigating circumstances upon the defendant, as long as the state retains the burden of proving every element of the offense and the existence of an aggravating circumstance. See Walton v. Arizona (1990), 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511. This Court expressly stated: "We are not persuaded by any of Smith's arguments urging us to find constitutional error in the allocation of burdens of proof." Smith II, 863 P.2d at 1011.

In this appeal, as in Smith II, Smith relies upon People v. Young (Colo. 1991), 814 P.2d 834. In Young, the Supreme Court of Colorado held a Colorado death penalty statute unconstitutional because the court concluded that the statute mandated a death penalty when a jury decided the aggravating and mitigating factors were equally balanced. In Smith II, 863 P.2d at 1012, this Court

9

considered and rejected Smith's argument based upon _Young._ we decline to reconsider that argument here.

Smith also relies upon State v. Wood (Utah 1981), 648 P.2d 71, in urging that a beyond-a-reasonable-doubt standard should be adopted for the weighing of aggravating and mitigating circumstances. However, Utah's statutory scheme is not equivalent to Montana's. In Utah, the sentencing court is to review a set of mitigating circumstances and then "shall retire to consider the penalty." Section 76-3-207(4), Utah Code Ann. Utah's statutes contain no equivalent to § 46-18-305, MCA. _Wood_ is neither controlling nor persuasive.

The Ninth Circuit Court of Appeals has observed that "[t]he United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." Harris v. Pulley (9th Cir. 1982), 692 F.2d 1189, 1195, _rev'd on other grounds_, Pulley v. Harris, 465 U.S. 37 (1984). There is no constitutional requirement that a reasonable doubt standard be used to determine imposition of the death penalty.

Smith has cited no direct authority requiring this Court to abandon its holding in _Smith II_ that Montana's death penalty statutory scheme is constitutional in its allocation of the burdens of proof of aggravating and mitigating circumstances. Nor has he demonstrated any other valid reason why we should do so. We reaffirm that holding.

10

ISSUE 3

Are the court's findings of the existence or nonexistence of aggravating and mitigating circumstances supported by the evidence?

In this case, the presence of two aggravating circumstances was undisputed. Smith has conceded that the offenses of which he has been convicted are deliberate homicides which were part of a scheme or plan which, if completed, would result in the deaths of more than one person, as described under § 46-18-303(5), MCA, and aggravated kidnappings which resulted in the deaths of the victims, as described under § 46-18-303(7), MCA.

Smith points out that, in considering whether mitigating circumstances are present, a sentencing court must not simply run down the list of possible mitigating circumstances. See Smith v. McCormick, 914 F.2d at 1168. In this case, however, the District Court did much more than that. With ample citation to the record, the court meticulously detailed its analysis of the evidence of each possible mitigating and aggravating circumstance as applied to each of the four separate offenses for which Smith was being sentenced. Because the mitigating and aggravating circumstances are the same for all four offenses charged against Smith, we here consider collectively for all four offenses the court's findings concerning aggravating and mitigating circumstances.

Smith claims that the eleven mitigating circumstances found by the District Court must necessarily outweigh the two aggravating circumstances. He also claims that the establishment of one or

11

more mitigating circumstance requires mitigation as a matter of law.

Smith's claims do not reflect the statutory directives of § 46-18-305, MCA. Contrary to Smith's claims, under § 46-18-305, MCA, the existence of one or even eleven mitigating circumstances is not a bar to imposition of the death penalty <u>unless the mitigating circumstances are "sufficiently substantial to call for leniency.</u>"

Smith argues that this Court must conduct its own reweighing of the aggravating and mitigating circumstances, citing Clemons v. Mississippi (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725. Smith miscites <u>Clemons</u>. In that case, the United States Supreme Court clarified:

> Nothing in this opinion is intended to convey the impression that state appellate courts are required to or necessarily should engage in reweighing or harmless-error analysis when errors have occurred in a capital sentencing proceeding. Our holding is only that such procedures are constitutionally permissible.

<u>Clemons</u>, 494 U.S. at 754. In fact, we conclude that the reweighing proposed by Smith would be wholly inappropriate if done based on the cold record available to an appellate court

Smith admits that there is no statutory requirement that this Court conduct a reweighing of the mitigating and aggravating circumstances. Section 46-18-310(2), MCA, only requires the Court to determine "whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances." Smith argues, however, that in State v. Keith

12

(1988), 231 Mont. 214, 754 P.2d 474, this Court conducted a reweighing of the evidence.

Again, Smith is incorrect. The Court in <u>Keith</u> stated that its role is to conduct an "independent review of the trial court record," not an "independent reweighing" of the aggravating and mitigating circumstances. The Court stated:

> In so doing, we are not usurping the position of the District Court as the primary entity in Montana's system of criminal jurisprudence[;] rather we mean to insure that the death penalty, unique in its severity . . . is not wantonly or arbitrarily and capriciously imposed.

<u>Keith</u>, 754 P.2d at 465, quoting <u>Smith I,</u> 705 P.2d at 1096-97.

Under § 46-18-310(2), MCA, then, this Court's role is not to reweigh the aggravating and mitigating circumstances, but to instead determine whether the evidence supports the sentencing judge's findings concerning their existence or nonexistence. We here apply that standard of review.

The District Court found that Smith established by a preponderance of the evidence the mitigating circumstance that he had no significant history of prior criminal activity, as provided under § 46-18-304(1)(a), MCA. Although Smith, who was in his mid-twenties at the time he committed these crimes, had served **time** in Canadian federal prisons, his criminal record did not include any crimes of violence and consisted generally of thefts and crimes involving alcohol or drug abuse.

As to the mitigating circumstance that the crimes were committed while under the influence of extreme mental or emotional disturbance as provided at § 46-18-304(1)(b), MCA, Smith presented

13

evidence that he came from a dysfunctional family and that he had been building up rage toward his father for many years. Smith's expert social worker, Shawn Trontel, admitted, however, that she believed Smith's rage was not isolated to these offenses. Smith's expert psychologist, Dr. Evans, testified that Smith still harbors angry feelings toward authority figures. The District Court also cited, as evidence that Smith was not suffering from severe emotional distress at the time of the crimes, Smith's own description of his actions in committing the crimes and the other evidence of the deliberateness of his actions in committing the crimes and in attempting to cover them up.

Smith did not submit evidence that he was acting under extreme duress or the substantial domination of another person, as a mitigating circumstance pursuant to § 46-18-304(1)(c), MCA. In fact, the evidence pointed toward the conclusion that Smith was the instigator and main perpetrator of the kidnappings and homicides.

Smith contends that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, pursuant to § 46-18-304(1)(d), MCA. As evidence of this mitigating circumstance, he submitted evidence of his history of drug and alcohol abuse and his use of alcohol on the day of the kidnappings and murders. Dr. Evans testified that Smith's IQ score as measured at the time of his initial incarceration for these crimes was over 10 points lower than his measured IQ scores at age 17 and prior to this sentencing hearing. Smith

14

claims this establishes that his mental capacity was affected by drugs and alcohol at the time of the crimes.

The District Court found, however, that in this case there was evidence of premeditation, an intelligent plan to avoid arrest, and motivation for the homicides, all contrary to Dr. Evans' testimony concerning a "typical" drug-caused homicide. The court found that Smith's actions **at** the **time** of the murders and afterwards to cover up his crimes were calculated and carefully implemented to further the efforts of himself and his two companions to obtain a vehicle and to leave no witnesses. Moreover, 'the court noted Dr. Evans' testimony that Smith had an elevated score on a scale of the Minnesota Multiphasic Personality Inventory indicating a person with poor judgment and unstable, irresponsible, self-centered, immature, anti-social, aggressive, or assaultive features.

Smith testified at the 1995 sentencing hearing that, as he, Rodney Munro and Andre Fontaine hitchhiked on August 4, 1982, he kept a sawed-off 22 caliber rifle hidden in his backpack and bullets in his shirt pocket. When the victims made a rest stop after they had picked up the three hitchhikers, Smith put a gun to the head of the victim who had been driving. Munro then put a knife to the throat of the other victim. Smith and Munro marched the victims into the woods, where they could not be seen from the highway. Smith testified that as they left the car, one of the victims asked him not to shoot them. After they had walked into the trees, Smith shot the first victim in the back of the head. He recalled seeing a look of incredulity on Munro's face. Smith then

15

reloaded his weapon with a bullet from his shirt pocket and shot the other victim in the head as he lay on the ground

After the shootings, Fontaine took the wheel of the vehicle. At Smith's insistence, however, Fontaine pulled over and let Smith drive, because Smith felt Fontaine was "an erratic driver." After he was arrested several weeks later in Wyoming, Smith attempted to hire someone to move the victims' bodies "to a place where they will never be found."

After considering the evidence, the District Court found that Smith's capacity to appreciate the criminality of his actions at the time of the crimes was only minimally impaired, and that any reduction in his cognitive ability left him significantly above the level required to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.

Smith does not argue as mitigating circumstances that the victims were participants in his conduct or that they consented to his acts pursuant to § 46-18-304(1)(e), MCA. Nor does he argue that he was a minor accomplice in an offense committed by another or that he was under the age of eighteen at the time of the crimes, pursuant to § 46-18-304(1)(f) or (g), MCA.

The District Court documented its consideration of Smith's evidence of other facts in mitigation under the "catchall" mitigation subsection, § 46-18-304(2), MCA--"[t]he court may consider any other fact that exists in mitigation of the penalty." Under that subsection of the statute, the court considered the evidence concerning Smith's violent, abusive, and dysfunctional

16

family life; his history of drug and alcohol abuse with no treatment; that he was operating under a mental or emotional disturbance at the time of the offenses; and that his **capacity** to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was minimally impaired.

In its findings concerning "any other fact that exists in mitigation of the penalty," the court also considered that Smith was initially offered a plea agreement for a sentence other than death. It documented its consideration of the evidence concerning Smith's conduct while imprisoned, including his participation in educational programs through which he earned a G.E.D. and some college credits. Additionally, the court considered the evidence of Smith's continuing contact with his family.

The court noted as a mitigating factor the amount of time Smith has already spent on death row. The court found that Smith is generally considered a quiet prison inmate, but that he has been in one documented fight with another prisoner. The court found that Smith's movement and freedom in his maximum security placement at Montana State Prison are severely restricted. The court also noted the evidence that, in a 1990 letter to a fellow inmate, Smith impliedly threatened the life of a Flathead County Attorney, writing that the attorney "won't be around to gloat" about Smith's next death sentence.

The court also considered as a mitigating circumstance under the statutory "catchall" provision the lesser sentence imposed on Rodney Munro, who was sentenced to life imprisonment for his role

in these crimes. The court noted, however, Smith's leadership role in these crimes.

The court found that Smith's apologies and expressions of remorse for his crimes were a factor to be considered in mitigation under § 46-18-304(2), MCA. However, it found that these apologies and expressions of remorse are relatively recent and are diminished as acceptance of responsibility by Smith's statements that "it wasn't me, not the true me," and "there was no plan to this, no plan at all."

The District Court's 82-page findings, conclusions, and judgment represent a thorough and individualized consideration of the aggravating and mitigating circumstances in this case. After reviewing the record, we conclude that the District Court's extensive findings concerning aggravating and mitigating circumstances are supported by the evidence.

ISSUE 4

Did the court erroneously rely upon the reports and testimony of Dr. Stratford in reaching its decision, and if it did so rely, did such reliance violate Smith's right against self-incrimination, right to counsel, and right to due process?

Dr. Stratford was the psychiatrist appointed in 1983 to examine Smith and to prepare a psychological report to the court for sentencing purposes. Smith moved in limine to preclude the use of Dr. Stratford's testimony and report at the 1995 sentencing hearing. In response, the District Court ruled that the State could use Dr. Stratford's testimony and report only as rebuttal to

18

Smith's evidence of mitigating circumstances. At the hearing, the State did not call Dr. Stratford as a witness, nor did it introduce his report into evidence.

In its findings reporting the history of this case, the District Court made the following finding concerning events in 1983 :

> 20. The District Court granted Defendant Smith's Motion for a psychiatric examination and appointed a psychiatrist, Dr. William Stratford, to examine Defendant Smith and report to the Court on Defendant Smith's mental condition at the time of the murders. At a hearing on December 1, 1983, Dr. Stratford testified that Defendant Smith's consumption of drugs and alcohol would not have substantially impaired his ability to appreciate the criminality of his conduct on August 4, 1982.

The court further found:

> 22. The United States Court of Appeals for the Ninth Circuit found two errors in Defendant's sentencing. First, citing Ake v. Oklahoma, 470 U.S. 68 (1985), the Court held the sentencing court had erred by failing to appoint an independent psychiatrist for Defendant Smith. The Court found that Defendant Smith's rights to due process had been violated because he was denied expert assistance in preparing his claims of mitigating circumstances.

Smith contends that the above reference to Dr. Stratford's report in the findings is contrary to the Ninth Circuit Court's holding in Smith v. McCormick.

We disagree. The reference to Dr. Stratford's report in finding number 20 can best be described as a historical reference. Dr. Stratford's report is not discussed in the court's detailed findings concerning mitigating circumstances; only evidence which was admitted at the sentencing hearing is there discussed or relied upon. Nowhere in the court's findings discussing Smith's mental

19

history is Dr. Stratford's opinion discussed or relied upon. Further, nowhere in the court's discussion of Smith's ability to appreciate the criminality of his conduct is Dr. Stratford's report discussed or relied upon.

We hold that the District Court's finding number 20 is not contrary to the Ninth Circuit Court's opinion in Smith v. McCormick, and that the finding does not establish that the court erroneously relied upon Dr. Stratford's opinion. We therefore need not discuss the effect of any such alleged reliance.

ISSUE 5

Did the District Court err by excluding mitigating evidence from consideration?

Here, Smith refers in part to his offered proportionality evidence. Smith contends that the District Court was required to consider his proportionality evidence as "relevant mitigating evidence" pursuant to § 46-18-304(2), MCA, and Smith II.

In Smith II, 863 P.2d at 1014-17, this Court remanded this case for the District Court's consideration of relevant mitigating evidence concerning Smith's conduct while incarcerated. That proposed evidence related specifically to Smith, as does each mitigating circumstance specifically enumerated under § 46-18-304, MCA. In contrast, the proportionality evidence which Smith offered at his 1995 sentencing did not relate specifically to Smith, but was instead a series of one- or two-paragraph summaries of other Montana homicide cases.

20

As further described under Issues 6 and 7 below, Montana's statutory death penalty scheme specifically provides for a proportionality review by this Court as part of its automatic review of all death sentences imposed, pursuant to §§ 46-18-307 through -310, MCA. Such consideration by this Court, with its statewide viewpoint, serves as a check to prevent imposition of the death penalty in a wanton and arbitrary fashion.

This Court's holding in Smith II cannot be read to require a sentencing court to consider as mitigating evidence information on the sentences imposed in other cases. Proportionality "evidence" does not relate to the specific defendant and the specific crime(s) before the sentencing judge, and therefore cannot be considered as a mitigating factor. We hold that the District Court did not err in refusing to consider Smith's offered proportionality evidence at the sentencing hearing.

At oral argument, Smith further contended that the District Court failed to consider in its sentencing order the testimony of his teacher at the Montana State Prison. It is true that the court did not make findings specifically referring to that witness. However, as discussed above, the court specifically noted as a mitigating factor under the "catchall" provision of § 46-18-304(2), MCA, Smith's efforts at rehabilitation, his participation in educational programs, and "progress which Defendant Smith has made in his educational program." The contention that the court failed to consider the testimony of Smith's teacher is therefore without merit

Smith next argues that the court persevered in the same error which caused the Ninth Circuit Court of Appeals to conditionally grant his petition for writ of habeas corpus in 1990--weighing each item of mitigating evidence separately, instead of along with all other evidence of mitigating circumstances. He contends that the court used the "sufficiently substantial" standard as a qualifier to exclude from consideration as mitigators any factors which did not excuse his conduct. He argues that the court persisted in weighing each mitigating circumstance against the "full moral weight of the crime" and failed to consider the totality of the mitigating circumstances.

The District Court's findings and conclusions belie these assertions on their face. The court made extensive findings concerning the evidence which Smith submitted in mitigation. After carefully describing the evidence as to each statutory mitigating circumstance which it found was not proven, the court explained its reasoning in finding that Smith had failed to prove the existence of that mitigating circumstance by a preponderance of the evidence. Then, in discussing the "catchall" provision of § 46-18-304(2), MCA, the court reconsidered Smith's evidence and expressly stated that "considered alone or in conjunction with all other mitigating circumstances, this circumstance is not sufficiently substantial to call for leniency within the meaning of § 46-18-305, MCA."

Additionally, in its conclusions of law, the court expressly stated:

> The Court concludes that these mitigating circum-stances, by themselves when considered alone or in

22

> conjunction with all other mitigating circumstances and
> personality traits of Defendant Smith, are not suffi-
> ciently substantial to call for leniency in this case
> within the meaning of § 46-18-305, MCA.

(Emphasis added.) We conclude that the court used the correct' standard in weighing aggravating and mitigating circumstances.

Finally, Smith asserts that the evidence of his witnesses was not given the proper effect or consideration. This claim goes to the weight of the evidence, which is well-established as within the province of the sentencer. Eddings v. Oklahoma (1982), 455 U.S. 104, 114-15, 102 S.Ct. 869, 877, 71 L.Ed.2d 1, 11.

We hold that Smith has failed to establish that the District Court excluded mitigating evidence from consideration.

ISSUE 6

Does the § 46-18-310(3), MCA, requirement that this Court undertake a proportionality review deny a capital defendant due process of law?

Section 46-18-310, MCA, provides:

> The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:
>    (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>    (2) whether the evidence supports the judge's finding of the existence or nonexistence of the aggravat- ing or mitigating circumstances enumerated in 46-18-303 and 46-18-304; and
>    (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration.

Smith maintains that the absence of statutory guidance or procedure on how to conduct the proportionality review under

23

subsection (3) results in a failure of due process. He argues that once a statutory requirement for a proportionality review is established, due process protections attach to the review process.

In Vernon Kills On Top v. State (November 25, 1996), No. 94-183, slip op. at 41, this Court held that the imposition of a death sentence by a state court in Montana must be reviewed for compliance with the proportionality and individualized treatment requirements set forth in Enmund v. Florida (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140. In both Enmund and Vernon Kills On Top, the defendants argued against imposition of the death penalty based upon their roles as mere accomplices in the crimes for which they were sentenced to death. That type of argument has not been raised in the present case.

In Enmund, the United States Supreme Court held that the death penalty may be constitutionally imposed only after the State focuses on the defendant's personal intent, character, and culpability, and not merely on the defendant's role as an accomplice in a crime. Section 46-18-310(3), MCA, imposes equivalent requirements, providing that this Court's mandatory proportionality review of death sentence cases shall include determination of whether the sentence of death is disproportionate to the penalty imposed in similar cases, "considering both the crime and the defendant."

We conclude that Montana's death penalty sentencing statutes provide notice to capital defendants that a proportionality review will be undertaken by this Court, and of the method thereof.

Smith, like other capital defendants in Montana, had notice of the scope of the proportionality review to be conducted by this Court. Although he did not avail himself of the opportunity to do so, he could have submitted his analysis of the proportionality of his sentence as part of his arguments in this consolidated appeal.

We hold that the proportionality review process established under Montana statutes does not violate due process.

ISSUE 7

Is the sentence imposed disproportionate to the penalty imposed in similar cases?

Smith insists that the proportionality review must include cases which were not appealed to this Court and in which the death penalty was not imposed. In McCleskey v. Kemp (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262, the United States Supreme Court held that the United States Constitution does not require a proportionalityreviewwhichincludes similarly-situateddefendants who have not received the death penalty. The Court stated:

> [A]bsent a showing that the Georgia capital punishment system operates in an arbitrary and capricious manner, McCleskey cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did <u>not</u> receive the death penalty. In <u>Gregg</u>, the Court confronted the argument that "the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law," 428 U.S. at 199, specifically the opportunities for discretionary leniency, rendered the capital sentences imposed arbitrary and capricious. We rejected this contention[.]

<u>McCleskey</u>, 481 U.S. at 306-07. In reaching its decision, the Court quoted Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, in which it recognized the existence of discretionary

25

stages throughout the criminal justice system and that at any stage there may be a decisionmaker who removes a defendant from consideration as a candidate for the death penalty. McCleskey, 481 U.S. at 307. The Court reaffirmed that "[n]othing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution." McCleskey, 481 U.S. at 307, citing Gregg.

The Court further elaborated as follows:

> The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt. If sufficient evidence to link a suspect to a crime cannot be found, he will not be charged. The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence remains a variable throughout the criminal justice process and may influence a prosecutor's decision to offer a plea bargain or to go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentencing authority. The foregoing factors necessarily exist in varying degrees throughout our criminal justice system.

McCleskey, 481 U.S. at 307 n.28.

On appellate review of a death penalty case, our evaluation of the proportionality of the death sentence imposed must take into account the discretionary stages in all criminal cases, as described above. A further rationale for limiting proportionality review of other cases to cases in which the death penalty was proposed is that only when the death penalty is sought will a

26

record exist concerning aggravating and mitigating circumstances. See Tichnell v. State (Md. 1983), 468 A.2d 1.

In State v. Coleman (1979), 185 Mont. 299, 605 P.2d 1000, sentence vacated, 874 F.2d 1280 (9th Cir. 1989), this Court recognized that "[l]eniency in one case does not invalidate the death penalty in others." Coleman, 605 P.2d at 1021. In Coleman, however, the Court expressly set down slightly expanded guidelines for the cases to be considered in its proportionality review. As set forth in Coleman, our review should include every similar case considered on appeal in which the death penalty could have been imposed or was imposed. Coleman, 605 P.2d at 1020.

Coleman was convicted of the aggravated kidnapping and deliberate homicide of a young woman who had given a ride to the hitchhiking Coleman and his companion. In its proportionality review in Coleman, this Court considered cases in which "the defendant has been charged with kidnapping and murder of the victim of the kidnapping and where the defendant has been charged with aggravated kidnapping where the victim has been killed." Coleman, 605 P.2d at 1020-21.

With the above standards in mind, we must here examine the proportionality of the death sentence in this case as compared with those cases appealed to this Court in which the defendant has been convicted of aggravated kidnappings and deliberate homicides of two victims. We must also look to other cases in which the death penalty has been imposed in Montana.

Two cases have been appealed to this Court since the death penalty was reenacted in I977 in which the defendants were convicted of the aggravated kidnappings and deliberate homicides of more than one victim. In both of those cases, the death penalty was imposed. In no case appealed to this Court since 1977 has a sentence other than death been imposed for a defendant's conviction of double aggravated kidnappings and double deliberate homicides of those victims.

Terry Langford pled guilty to two counts of deliberate homicide in the execution-style slayings of a couple in their home outside Ovando, Montana. State v. Langford (1991), 248 Mont. 420, 813 P.2d 936. Langford further pled guilty to aggravated kidnapping of each of the two victims, based upon his unlawful restraint of them before he killed them. Langford's lack of an extensive criminal record was a mitigating circumstance considered at sentencing. He also presented evidence at sentencing concerning his troubled childhood and his past drug use. Langford was sentenced to death for each of the two counts of deliberate homicide and for each of the two counts of aggravated kidnapping. This Court affirmed those sentences in Langford.

David Dawson abducted a family staying in a room adjoining his in a Billings, Montana, motel and killed three of the four family members. In State v. Dawson (1988), 233 Mont. 345, 761 P.2d 352, we affirmed Dawson's convictions of three counts of deliberate homicide, four counts of aggravated kidnapping, and robbery. Despite the mitigating circumstance of Dawson's lack of a signifi-

28

cant history of prior criminal activity, Dawson was sentenced to death for each of the three counts of aggravated kidnapping in which he was also convicted of deliberate homicide of the victim. He was further sentenced to death for each of the deliberate homicides.

None of the other persons sentenced to death in Montana since 1977 have been so sentenced based upon convictions of double deliberate homicide and double aggravated kidnapping. Lester Kills On Top was sentenced to death for convictions of robbery, aggravated kidnapping, and deliberate homicide of a victim whom he and his accomplices offered a ride home from a bar. State v. Lester Kills On Top (1990), 241 Mont. 378, 787 P.2d 336, sentence vacated, 901 P.2d 1368 (1995). In State v. McKenzie (1980), 186 Mont. 481, 608 P.2d 428, Duncan McKenzie was convicted of deliberate homicide by means of torture and aggravated kidnapping of a rural schoolteacher. He was sentenced to death and was executed in May 1995. In State v. Keith (1988), 231 Mont. 214, 754 P.2d 474, Keith pled guilty to two counts of aggravated assault, two counts of aggravated kidnapping, and one count of deliberate homicide. Keith was sentenced to death for one of the aggravated kidnappings and for the deliberate homicide, and this Court affirmed. Vernon Kills On Top, whose death sentence was recently reversed by this Court, was sentenced to death for his role as an accomplice in the aggravated kidnapping and deliberate homicide of a single victim. State v. Vernon Kills On Top (1990), 243 Mont. 56, 793 P.2d 1273, sentence vacated, Vernon Kills On Too v. State, No. 94-183.

We have considered both the crimes and the defendant in the present case in proportion to the crimes and the defendants in the cases discussed above. We conclude that the sentences of death herein imposed are not excessive or disproportionate to the penalty imposed in similar cases.

ISSUE 8

Was the sentence imposed by the court under the influence of passion, prejudice, or any other arbitrary factor?

Pursuant to § 46-18-310(1), MCA, this Court is to determine whether a sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Smith points out that in Keith, 754 P.2d at 486-87, this Court acknowledged that it would consider altering or reversing a sentence which was influenced by passion, prejudice, public opinion, or the media.

In arguing this issue, Smith refers to several newspaper articles concerning his case. One is an editorial dated January 12, 1992, long before Judge Larson, the 1995 sentencing judge, assumed jurisdiction in this case. The second article is dated January 22, 1995. Again, it is an editorial, and it expresses frustration with the delay in this case. Smith has not demonstrated any connection between either of those newspaper articles and Judge Larson. The third newspaper article to which Smith refers was written after the sentencing, in January 1996. Because it was written after the sentencing, it cannot be considered to have influenced the sentencing.

30

Smith also refers to two newspaper articles concerning defense expenses in this case. These articles were written in the months immediately preceding and following the 1995 sentencing hearing. The second of these two articles quotes Judge Larson as saying that he did not set down detailed guidelines for defense expenses. "That's not usually done. This is a death penalty case, and expenses run high." Judge Larson is also quoted as saying that he was

> sensitive to the rights of the defense team to meet with and have witnesses testify. Early on, I limited the travel of their expert witnesses because of their per-hour costs. Instead, the defense attorneys, who are getting much less an hour, do the traveling.

The article further quoted Judge Larson as saying that right before and after the sentencing hearing,

> [i]t seemed more important for my focus to be on the merits of the case, rather than divert attention and scrutinize each expense voucher so closely. I'll tighten down again now as we step back from the sentencing.

> . . . I try to take into account some of the different standards and expectations of defense witnesses from other areas. I've tried to be flexible and understanding without letting things get out of hand.

> In fact, I recently refused reimbursement to [Smith's attorney] for his telephone calls with you [the reporter].

Smith particularly criticizes the quotation that "I'll tighten down again now as we step back from the sentencing" as indicative that the court had already decided to sentence Smith to death.

We have reviewed the newspaper articles and the quotations attributed to Judge Larson. We discern nothing in Judge Larson's

31

reported answers to questions which reveals an influence of passion, prejudice, or other arbitrary factors as to the Smith matter. On the contrary, we conclude that Judge Larson's comments reveal a balanced and impartial demeanor as to this matter.

Smith also contends that passion, prejudice, or other arbitrary factors arise because of the original presentence investigation report prepared for the 1995 sentencing, to which he objected. However, after Smith objected to the report at a presentencing hearing, a modified presentence investigation report was submitted to the court. Smith has made no objections to the modified presentence investigation report, from which everything to which he objected in the earlier report had been deleted. The court did not refer to the earlier report its findings and conclusions.

Smith offers only speculative assertions about the effect of his prior death sentences on the District Court. He cites Romano v. Oklahoma (1994), 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1, and People v. Davis (Ill. 1983), 452 N.E.2d 525, as authority for the possible prejudicial effect of a sentencer's knowledge that a defendant has been previously sentenced to death

Both Romano and Davis dealt with the effect of a jury's knowledge that a defendant has been previously sentenced to death. It is well-established that greater safeguards are required to prevent the influence of possibly prejudicial information on members of a jury than to prevent such effects upon a judge, who is assumed to be capable of rising above such influences. "Absent

32

proof to the contrary, the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors."   State v. Beaty (Ariz. 1988), 762 P.2d 519, 531, cert. denied, 491 U.S. 910 (1989).

Our review of the record convinces us that the comprehensive and systematic findings and conclusions of the District Court were conscientiously prepared.  We hold that Smith has not established that his sentence was imposed by the court under the influence of passion, prejudice, or any other arbitrary factor.

ISSUE 9

Was Smith's right to due process or his right to be free from cruel and unusual punishment violated by resentencing him to death, because of the amount of time he has spent on death row and the number of sentencing hearings held in this case?

At the time of the oral argument in this appeal, Smith had spent approximately thirteen years on death row and had four sentencing hearings.  In arguing that his execution after such a long period of incarceration would amount to cruel and unusual punishment, he relies on Lackey v. Texas (1995),    U.S. ___, 115 S.Ct. 1421, 131 L.Ed.2d 304.

Lackey petitioned the United States Supreme Court for a writ of certiorari, arguing that his seventeen years on death row violated the Eighth Amendment's prohibition against cruel and unusual punishment.  The Court denied the petition for the writ. Justice Stevens, joined by Justice Breyer, filed a memorandum with

33

the denial of certiorari, writing that Lackey's claim was "not without foundation." Lackey, 115 S.Ct. at 1421.

Justice Stevens' memorandum in connection with the Court's denial of certiorari cannot be construed as a controlling decision on this issue and has not been regarded favorably in the federal 'courts. In McKenzie v. Day (9th Cir. 1995), 57 F.3d 1461, adopted en banc, 57 F.3d 1493, Duncan McKenzie attempted to obtain a stay of his execution by showing the likely success of his claim that the twenty-year delay in his execution was cruel and unusual. The Ninth Circuit Court of Appeals denied the stay of execution. The court stated, "we conclude that it is highly unlikely that McKenzie's Lackey claim would be successful if litigated to its conclusion." McKenzie, 57 F.3d at 1467. The court reasoned that the cause for the delay in carrying out McKenzie's sentence was that "McKenzie has availed himself of procedures our law provides to ensure that executions are carried out only in appropriate circumstances." McKenzie, 57 F.3d at 1466-67. Thus, the court reasoned, the delay was "a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences." McKenzie, 57 F.3d at 1467. The court recognized the ultimate irony and lack of logic in the Lackey claim: If an Eighth Amendment challenge based on delay were to prevail, then the procedures designed to promote fair adjudication in death penalty cases would in themselves be used to ultimately defeat their own purpose. See

34

also White v. Johnson (5th Cir. 1996), 79 F.3d 432, and Stafford v. Ward (10th Cir. 1995), 59 F.3d 1025.

In White, the Fifth Circuit Court of Appeals reasoned:

> [T]here are compelling justifications for the delay between conviction and the execution of a death sentence. The state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards. As a result, states allow prisoners such as White to challenge their convictions for years.

White, 79 F.3d at 439.

It is clear from the record in this case that Smith has benefitted from the appellate and federal review process of which he has availed himself and which has resulted in the delay and the multiple sentencing hearings in this case. We hold that Smith has not established violation of his right to due process or his right to be free from cruel and unusual punishment as a result thereof.

Smith further argues that imposition of the death penalty after a long delay cannot have any deterrent effect. The United States Supreme Court has recognized, however, that "the value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures. "Gregg, 428 U.S. at 186. Accordingly, this argument should be presented to the Montana Legislature, not to this Court.

CONCLUSION

The District Court imposed upon Ronald Allen Smith four separate death sentences: for the aggravated kidnapping of Harvey Mad Man, Jr.; for the deliberate homicide of Harvey Mad Man, Jr.; for the aggravated kidnapping of Thomas Running Rabbit, Jr.; and

35

for the deliberate homicide of Thomas Running Rabbit, Jr. Having considered the issues raised on appeal and the issues required on automatic review of a death penalty case under § 46-18-310, MCA, we affirm the judgment of the District Court.

_____
Chief Justice

We concur:

_____

_____

_____

_____

Justices

36

Justice Terry N. Trieweiler specially concurring.

I agree that the District Court's findings are supported by the evidence and that it did not deviate from the statutory process for arriving at its sentence. I also agree that the death penalty is not disproportionate to the penalty that has been imposed in similar cases in this State, and that there is no persuasive evidence that the sentencing judge was influenced by passion or prejudice. Therefore, while I do not agree with all that is said in this Court's opinion, I concur that there has been no issue raised which would warrant reversal of the District Court.

I also concur, however, with that part of Justice Leaphart's concurring opinion in which he concludes that our obligation to review a defendant's death sentence for proportionality cannot be limited to those cases in which the death penalty was proposed by the prosecution and which were appealed to this Court. Such an arbitrary definition of the class of cases to be reviewed dilutes the primary purpose for review.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing specially concurring opinion.

_____
Justice

37

Justice W. William Leaphart, specially concurring.

I concur with the decision of the Court and write separately to express my concerns about Issue 7, the scope of our review in determining proportionality of the sentence under § 46-18-310(3), MCA; and Issue 9, cruel and unusual punishment.

## Scope of Review

While I agree that, under existing precedent, the sentence imposed was not disproportionate to the penalty imposed in similar Montana cases, I do not agree with the holding in State v. Coleman (1979), 185 Mont. 299, 605 P.2d 1000, and reiterated in this opinion that when we engage in a proportionality review, we are restricted to comparing cases in which the death penalty was proposed by the prosecution and which were appealed to this Court. In other words, we cannot consider those cases in which (1) the prosecutor could have sought the death penalty but, for any number of reasons chose not to, or (2) the prosecutor sought the death penalty but the judge, for any number of reasons, chose not to impose the death sentence.

In reviewing the question of proportionality, the scope of cases reviewed should hinge upon the similarity of the facts and the charges rather than whether the case came before us on appeal.

Assume that defendants A, B and Smith separately commit double aggravated kidnappings in different counties in the State of Montana which result in the death of their victims. The prosecutor in Smith's county seeks the death penalty and the judge imposes the

38

death penalty. The prosecutor in A's county is concerned about the tremendous costs of numerous appeals and appointed counsel which are inherent in imposing the death penalty so he chooses not to seek the death penalty. The prosecutor in B's county does seek the death penalty, however, the trial judge has religious opposition to the death penalty and chooses to impose a life sentence instead. B does not appeal the sentence.

Under our holding herein, despite the great similarity between the three offenses, we cannot consider the cases of defendants A or B because the death penalty either was not sought or not imposed. In restricting our scope of review to only those cases in which the death penalty was sought or imposed, we cite Coleman for the proposition that "[l]eniency in one case does not invalidate the death penalty in others." Coleman, 605 P.2d at 1021. I do not necessarily disagree with this statement. However, I seriously question whether it is a principle which has any practical application.

We also quote McCleskey v. Kemp (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262, for the proposition that "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime." McCleskey, 481 U.S. at 307 n.28. How do we determine whether other defendants were granted "leniency" or "mercy" based upon objective circumstances of the crime or were merely the incidental beneficiaries of other considerations? In my example set forth above, it cannot fairly be said that defendants A and B were "granted leniency." The fact

39

that they did not receive the death penalty was not attributable to the "objective circumstances of the crime." Rather, A's more lenient sentence was due to economic considerations of death penalty cases in general. B's good fortune was attributable to the religious beliefs of the trial judge. Considerations of economics and religion are not fact specific and yet they are quite often the driving force behind the choice of whether to seek or impose the death sentence. To categorize all such cases as cases of "leniency" or "mercy" and thus totally disregard them is facile and simplistic--especially given the stakes of the issue being considered.

Both this Court and the United States Supreme Court have recognized that, under our system of justice, there are discretionary stages in which a decisionmaker may remove a defendant from consideration as a candidate for the death penalty. McCleskey, 481 U.S. at 307. Due to the human factor in our system of justice, one judge may grant leniency and the other may not. However, the recognition that a judge may, based upon "objective circumstances of the crime" grant leniency, does not relieve us of our duty to ascertain whether a death sentence, when reviewed in a state-wide perspective, is arbitrary and capricious. If murder defendants in county C are subjected to death penalties because that county is not deterred by the costs of pursuing a death sentence while murder defendants in the less wealthy county of D, get off with life Imprisonment, that, in my view, is not attributable to a "leniency" factor inherent in our less than

40

perfect system of justice. Rather it is arbitrary and capricious. Likewise, if murder defendants in county E are subjected to death sentences while similar cases across the county line in county F are not because the prosecutor in F, for religious reasons, does not believe in the death penalty--that too suggests caprice. If the present defendant is convicted of double kidnapping resulting in homicides and if there have been ten similar crimes in the state, only one of which has resulted in a sentence of death, are we bound to look only at the one case, ignoring the other nine, and conclude that death would be proportional?

Many judges and legislators wiser than I have wrestled with both the morality and constitutionality of the death sentence. I do not pretend to raise any new questions or offer any new answers. However, in my capacity as an appellate judge, I am at a loss as to how I can truly review the proportionality of a death sentence by looking only at similar cases in which the death sentence was proposed or imposed while not considering similar cases in which it was never sought, and asking "why not?"

I recognize that the rationale for limiting proportionality review to cases in which the death penalty was proposed is that only in those cases will a record exist concerning aggravating and mitigating circumstances. In matters of life and death, however, the difficulty of review is hardly a sufficient rationale to ignore a potentially large body of relevant comparable cases. It would be preferable to require prosecutors, in cases which initially satisfy the requirements of § 46-18-303, MCA, (e.g., the prison riot cases

41

which fall within § 46-18-303(1), MCA) to make a record as to why they have chosen not to seek the death penalty. That record could then be filed with the Supreme Court for reference in subsequent proportionality reviews.

Having reviewed the cases of State v. Langford (1991), 248 Mont. 420, 813 P.2d 936, and State v. Dawson (1988), 233 Mont. 345, 761 P.2d 352, as well as the 28 case summaries set forth in Smith's submission entitled, "Proportionality Basis"--I conclude, that the sentence imposed is not out of proportion to the sentence imposed in those cases most similar in this state; that the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor and that the evidence supports the judge's findings concerning the existence or nonexistence of aggravating and mitigating circumstances. Section 46-18-310, MCA.

Despite my reservations about the scope of review, I conclude that under either the restricted Coleman standard or the more expansive standard I have suggested, the sentence imposed was not out of proportion to similar cases.

### Cruel and Unusual Punishment

Although I concur in the Court's conclusion on the cruel and unusual punishment issue (Issue 9), I do not agree with all that is said in rejecting the argument that having a defendant on death row for thirteen years is itself cruel and unusual punishment. The majority relies on the fact that this passage of time is attributable to Smith having availed himself of his right to appeal in both the state and federal forums. We cite McKenzie v. Day

42

(Mont. 1995), 57 F.3d 1461, 1467, for the proposition that the delay is "a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences."

In reviewing the amount of time that a defendant has spent on death row, a distinction should be drawn between the passage of time due to the mere filing of appeals and petitions and the passage of time attributable to the State's inability to impose the sentence in accordance with requirements of due process. In other words, it is not sufficient to attribute the delay to our "standards of decency." That suggests that we, as a society, out of a sense of decency, have provided defendants with a procedure whereby they can challenge their sentences and, if they choose to do so, they must live with the resulting delay. Such a rationale places all the blame for the delay at the feet of the defendant. This blame is misplaced, however, in a case such as this wherein the defendant has not only filed appeals, but has been successful in his federal court appeals. His success points to the fact that the blame properly rests with the State or the courts for having failed to appoint an independent psychiatrist and then having failed to prepare a new presentence investigation.

When a defendant is successful in his appeals, it cannot fairly be said that he is merely filing frivolous appeals in order to buy time. Rather, it raises more serious questions as to how long a defendant can be expected to languish on death row while the State and the trial courts are afforded repeated opportunities to

43

comply with due process.

Assume that a trial court imposed the following sentence: "I hereby sentence you to death. However, I am not going to advise you as to when you will be executed. You may be executed tomorrow, in six months, in two years or perhaps not for thirteen years." I have little doubt that such a sentence would be considered cruel and unusual punishment under the 8th Amendment and under Article II, Section 22 of the Montana Constitution. Although such a sentence was not imposed in the present case, the end result is no different. Due to procedural problems not attributable to Smith, he has been kept in suspense for some thirteen years as to whether or when he will be executed.

The Court notes that: "It is clear from the record that Smith has benefitted from the appellate and federal review process of which he has availed himself and which has resulted in the delay and the multiple sentencing hearings in this case." Assuming that Smith wishes to live, that statement is accurate. Any delay in imposition of the death sentence benefits Smith. However, does the Court's analysis change any if, instead of focusing solely on the benefit to the defendant, we acknowledge that the State has benefitted from Smith's counsel pointing out errors and from the courts having allowed the State successive chances to do its job correctly?

Short of establishing some arbitrary time period within which a death sentence must be carried out, I see no simple answer to the conundrum which results from the conflict between a defendant's

44

right to due process and appellate review and his right to be free from cruel and unusual punishment. In the final analysis, I must err on the side of affording the defendant his due process and appellate review, as lengthy as that process may be. Although.1 concur with the sentence imposed in this case, I have written to express my view that, like Justices Stevens and Breyer in Lackey v. Texas (1995), __ U.S.____, 115 S.Ct. 1421, 131 L.Ed.2d 304, I do not treat as completely without merit the argument that lengthy delays in the imposition of the death sentence may amount to cruel and unusual punishment under the 8th Amendment.

_W. William Daughart_
Justice