**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLARENCE RAY ALLEN,
            *Petitioner-Appellant,*

v.

STEVEN W. ORNOSKI, Warden, of
the California State Prison at San
Quentin; ATTORNEY
GENERAL OF THE STATE OF
CALIFORNIA,
            *Respondents-Appellees.*

Nos. 06-99001
        06-70206

D.C. No.
CV-00064-FCD-
DAD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, Jr., District Judge, Presiding

Submitted and Filed January 15, 2006
Pasadena, California*

Before: Susan P. Graber, Kim McLane Wardlaw, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Wardlaw

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

**COUNSEL**

Michael Satris, Bolinas, California, for the appellant.

Ward A. Campbell, Supervising Deputy Attorney General, Sacramento, California, for the appellee.

**OPINION**

WARDLAW, Circuit Judge:

Clarence Ray Allen appeals from the district court's order denying and dismissing in part his second petition for writ of habeas corpus and denying his requests for a stay of execution and for the issuance of a certificate of appealability on his Eighth Amendment claim based upon age and physical infirmity. He seeks a certificate of appealability and consideration on the merits of his age and physical infirmity claim, which, he argues, encompasses his *Lackey* claim, based on his long tenure on death row under "horrific conditions." *See Lackey*

*v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of certiorari). Allen also asks that if we consider the *Lackey* claim independently, we find that it is not a second or successive petition within the meaning of 28 U.S.C. § 2244 or, in the alternative, that we grant permission to file that claim in the district court.[1] Finally, for the first time on appeal, Allen challenges the constitutionality of 28 U.S.C. § 2254(d)(1), which outlines the circumstances in which a federal court may grant habeas relief from a state court judgment.

Because we conclude that reasonable jurists would not find debatable the district court's ruling that Allen failed to make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), we deny his motion for a certificate of appealability on his age and physical infirmity claim. Because we conclude that Allen's *Lackey* claim is a second or successive application which could "have been discovered previously through the exercise of due diligence," 28 U.S.C. § 2244(b)(2)(B)(i), and which we have previously rejected as a predicate for relief from execution, we affirm the district court's dismissal with prejudice of Allen's claim, and decline to authorize a second or successive application. Because Allen's challenge to 28 U.S.C. § 2254(d) is untimely and fails to satisfy the procedural requirements of our appellate rules, we decline to address its merits. We therefore deny Allen's request for a stay of execution because he has not demonstrated substantial grounds upon which relief may be granted, and we affirm the district court's denial and dismissal in part of his second writ petition.

---

[1]We hereby order that for purposes of this appeal Allen's motion for a certificate of appealability and his application for leave to file a "second or successive" habeas petition are consolidated.

# I.

## PROCEDURAL BACKGROUND

Allen was convicted and sentenced to death in 1982 for the murders of Bryon Schletewitz, Douglas White, and Josephine Rocha, which he orchestrated while incarcerated in Folsom Prison and serving a life sentence with the possibility of parole for the murder of Mary Sue Kitts.[2] Allen was fifty years of age when the murders and conspiracy occurred and fifty-two years of age at the time his death sentence was imposed.

The California Supreme Court affirmed Allen's conviction and sentence on December 31, 1986, *see People v. Allen*, 42 Cal. 3d 1222 (1986), and summarily denied his December 1987 and March 1988 supplemental habeas petitions. Allen filed his first federal habeas petition on August 31, 1988, and moved for an evidentiary hearing. The district court stayed proceedings to enable Allen to exhaust his state remedies. It reopened federal habeas proceedings in 1993. A magistrate judge presided over a six-day evidentiary hearing in April 1997, on the issue of ineffective assistance of counsel in the penalty phase. In March 1999, the magistrate judge issued Findings and Recommendations denying Allen's habeas petition. Following objections to the magistrate judge's report, the district court conducted a *de novo* review of the case in April 2001, in compliance with 28 U.S.C. § 636(b)(1)(C), holding argument on April 26, 2001. In May 2001, the district court issued a Memorandum and Order adopting in full the magistrate judge's Findings and Recommendations and denying Allen's petition. The district court issued a certificate of appealability on both the guilt and penalty phase issues, and

---

[2]The factual basis for Allen's jury convictions for triple-murder and conspiracy to murder seven persons is detailed in our opinion affirming the district court's denial of Allen's first habeas petition. *Allen v. Woodford*, 395 F.3d 979 (9th Cir.), *cert. denied*, 126 S. Ct. 134 (2005).

Allen appealed. In January 2005, we issued an opinion affirming the district court's denial of Allen's habeas petition. *Allen v. Woodford*, 395 F.3d 979 (9th Cir.), *cert. denied*, 126 S. Ct. 134 (2005).

After the Supreme Court denied Allen's petition for writ of certiorari, the Superior Court of Glenn County held a hearing on November 18, 2005, and appointed January 17, 2006, as the date of Allen's execution. On December 13, 2005, Allen filed a petition for clemency with the Governor of California, which the Governor denied on Friday, January 13, 2006. Allen petitioned for writ of habeas corpus and related orders in the California Supreme Court on December 23, 2005. On January 10, 2006, the California Supreme Court denied all relief.[3] Allen filed a petition for a writ of habeas corpus, a motion for a stay of execution, a motion for leave to proceed *in forma pauperis*, and an application for appointment of counsel[4] in the United States District Court for the Eastern District of California on January 12, 2006.

Allen's petition presents two distinct claims: (1) that his execution would violate the Eighth Amendment's prohibition against cruel and unusual punishment, incorporated into the Fourteenth Amendment Due Process Clause, because he is both elderly[5] and infirm[6]; and (2) that his execution would

---

[3]The same claims Allen brings before us in his habeas petition were brought before the California Supreme Court. The California Supreme Court denied Allen's habeas petition in a one-sentence order: "Petitioner's third petition for a writ of habeas corpus and request for stay of execution, filed December 23, 2005, is denied on the merits." *In re Clarence Ray Allen*, No. S139857 (Cal. Jan. 10, 2006).

[4]The district court granted Allen's motion for leave to proceed *in forma pauperis* and his application for appointment of counsel. The Warden does not cross-appeal these orders.

[5]Allen will be seventy-six years old on January 16, 2006, the day before his appointed date of execution.

[6]Allen suffers from a long list of infirmities, including blindness, hearing problems, advanced Type-2 diabetes, complications from a stroke, heart disease, and complications from a recent heart attack suffered in September 2005, which have left him confined to a wheelchair.

violate the Eighth Amendment because of the inordinate length of time, twenty-three years, he has spent on death row and the "horrific" conditions of his confinement, a *Lackey* claim, also known as "death row phenomenon." His petition does not challenge the constitutionality of 28 U.S.C. § 2254(d) in any respect, but instead states that the petition is brought "pursuant to 28 U.S.C. § 2254."

District Judge Frank C. Damrell, Jr. denied Allen's first claim on the merits and dismissed Allen's second claim for lack of jurisdiction. *Allen v. Ornoski*, No. Civ. S-06-64 FCD/ DAD (E.D. Cal. Jan. 12, 2006).

Judge Damrell properly analyzed Allen's claims independently to determine whether each constituted a "second or successive" habeas petition subject to the restrictions of 28 U.S.C. § 2244.[7] *See Lambright v. Stewart*, 220 F.3d 1022, 1024 (9th Cir. 2000) (examining each claim individually to determine whether standard for certificate of appealability was met); *see also United States v. Orozco-Ramirez*, 211 F.3d 862, 869 (5th Cir. 2000) ("We consider each claim independently in deciding whether it is 'second or successive' under AEDPA."). That Allen's age and physical infirmity claim both encompasses and is supported by his long tenure on death row does not eliminate our obligation also to consider it independently, especially when Allen asserted these as separate claims for relief in his second habeas petition and supporting memorandum of points and authorities filed in the district court. In addition, Allen specifically relied upon *Lackey* in the district court. Justice Stevens' concurrence in *Lackey* makes no reference to age or infirmity, but only to tenure. Because each claim now occupies a distinct procedural sphere, we analyze them independently from that perspective as well.

---

[7]Each of the parties has variously argued that the two claims should be considered as one and that they should be considered independently. We believe that the district court's separate treatment of the claims is analytically correct.

## II.

## CERTIFICATE OF APPEALABILITY ON ALLEN'S AGE AND PHYSICAL INFIRMITY CLAIM

[1] Having been denied a certificate of appealability on his age and physical infirmity claim by the district court, Allen asks us to certify this claim, as he must secure a certificate of appealability before he can proceed with the merits of his claims. *See* 28 U.S.C. § 2253(c)(1); 9TH CIR. R. 22-1; *see also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). A petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. 28 U.S.C. § 2253(c)(2); *see Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484; *see also Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). To meet this "threshold inquiry," *Slack*, 529 U.S. at 482, the petitioner " 'must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; *or* that the questions are adequate to deserve encouragement to proceed further.' " *Lambright*, 220 F.3d at 1025 (alteration and emphasis in original) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (internal quotation marks omitted)). Even if a question is well settled in our circuit, a constitutional claim is debatable if another circuit has issued a conflicting ruling. *See id.* at 1025-26. "[T]he showing a petitioner must make to be heard on appeal is less than that to obtain relief." *Id.* at 1025 n.4 (citations omitted); *see also Miller-El*, 537 U.S. at 337 (reaffirming the Court's holding in *Slack* "that a COA does not require a showing that the appeal will succeed"); *Silva v. Woodford*, 279 F.3d 825, 832 (9th Cir. 2002) ("It is essential to distinguish the standard of review for purposes of granting a COA from that for granting the writ.").

Allen argues that proceeding with the execution despite his old age and physical infirmities would deprive him of his con-

stitutional right under the Eighth Amendment to be free from cruel and unusual punishment. Allen's petition, however, displays a woeful lack of support for the proposition that the Eighth Amendment prohibits execution of the elderly and the infirm. Allen provides only one case which discusses an Eighth Amendment claim based upon the advanced age of an inmate, *Hubbard v. Campbell*, 379 F.3d 1245 (11th Cir.) (per curiam), *cert. denied*, 542 U.S. 958 (2004). *Hubbard* is unhelpful, however, because there the Eleventh Circuit upheld the district court's dismissal of Hubbard's petition for lack of subject matter jurisdiction on the ground that the claim should have been filed as a second or successive habeas petition. *Id.* at 1247. Allen cites no other authority favoring or disfavoring his legal position.

**[2]** Allen instead argues that the Supreme Court's recently developing Eighth Amendment jurisprudence naturally extends to a constitutional prohibition against executing the elderly and infirm. In support, Allen points to the Supreme Court's capital case decisions of the post-*Furman* era, in which the Court has gradually (1) enlarged the classes of persons who are ineligible for the death penalty, *see Ford v. Wainwright*, 477 U.S. 399 (1986) (executing the mentally incompetent is unconstitutional); *Thompson v. Oklahoma*, 487 U.S. 815 (1988) (executing youths under sixteen at time of offense is unconstitutional); *Atkins v. Virginia*, 536 U.S. 304 (2002) (executing the mentally retarded is unconstitutional); *Roper v. Simmons*, 125 S. Ct. 1183 (2005) (executing juveniles who committed the offense while under eighteen is unconstitutional), and (2) narrowed the range of offenses that are death-eligible, *see Coker v. Georgia*, 433 U.S. 584 (1977) (execution for offenses short of murder is unconstitutional); *Enmund v. Florida*, 458 U.S. 782 (1982) (executing those who aided a felony but did not kill or intend to kill is unconstitutional). Allen vaguely suggests that execution of an elderly person does not comport with "evolving standards of decency," in that the execution "offends humanity," provides no deterrence value, does not serve any retributive purpose,

and violates the norms of domestic and international law.[8] However, Allen's argument fails in two critical respects: (1) the Supreme Court's limitations on the use of the death penalty are grounded in the theory that some classes of persons are less culpable and therefore not deserving of the death penalty and Allen's age and infirmity do not render him less culpable at the time of his offenses; and (2) Allen cannot demonstrate the required "objective indicia of consensus" that "evolving standards of decency" now prohibit the execution of elderly and infirm persons. Thus, his contention that reasonable jurists could debate whether he has made a substantial showing of the denial of a constitutional right fails because there is no clearly established Supreme Court authority, or any legal authority, supporting his position, even if one stretches existing Supreme Court authority to its maximum reach.

The Supreme Court's rulings in *Roper*, *Atkins*, *Thompson* and *Enmund* are inextricably bound to the concept that the execution of certain classes of inherently less-culpable persons offends the Eighth Amendment's proportionality requirement. In *Roper*, the Supreme Court enumerated three traits of juveniles which, as a class, render them less culpable and therefore unsuitable to be placed in the worst category of offenders: (1) a "lack of maturity and an underdeveloped sense of responsibility" resulting in "impetuous and ill-considered actions and decisions;" (2) a heightened vulnerability to "negative influences and outside pressures;" and (3) personality that is "more transitory, less fixed." *Roper*, 125 S. Ct. at 1195. The Court found that "[t]heir own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to

---

[8]While international norms may also be instructive in this analysis, in light of the nonexistence of domestic authority supporting Allen's claim, and the lack of definitive international authority provided by Allen, we, as an intermediate court, decline to consider the asserted practices of foreign jurisdictions.

be forgiven for failing to escape negative influences in their whole environment," and therefore concluded that the social purpose of "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blame-worthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.* at 1195-96. The Court again focused on culpability in assessing whether executing juve-niles fulfilled the social purpose of deterrence and found that "the absence of evidence of deterrent effect is of special con-cern because the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Id.* at 1196.

In *Atkins*, the Court again linked "relative culpability" to the "penological purposes served by the death penalty." 536 U.S. at 317. With respect to retribution, the Court found that because "severity of the appropriate punishment necessarily depends on the culpability of the offender . . . an exclusion for the mentally retarded is appropriate." *Id.* at 319. Culpability was again key to the Court's finding that execution of the mentally retarded did not serve the penological purpose of deterrence, because "it is the same cognitive and behavioral impairments that make these defendants less morally culpable — for example, the diminished ability to understand and pro-cess information, to learn from experience, to engage in logi-cal reasoning, or to control impulses — that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Id.* at 320. The Court applied the same rationale of lessened culpability undermining the deterrence and retributive effects of capital punishment in holding that the Eighth Amendment prohibits the execution of persons who were under sixteen at the time of their offense. *See Thompson*, 487 U.S. at 833-38. Similarly, in *Enmund*, the Court assessed proportionality based upon the personal culpa-bility of the defendant, ruling that for an accomplice to a fel-ony, "criminal culpability must be limited to his participation

in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt." 458 U.S. at 801.

Allen heavily relies upon *Ford*, arguing that given Allen's age, failing health and length and conditions of confinement on death row the retributive purposes of capital punishment would not be served by his execution. In *Ford*, the Court held that the Eighth Amendment prohibits the execution of an insane defendant. In doing so, it relied in part on the rationale that the execution of a person who does not understand, or is not even aware of, the punishment that he is about to face does not serve the death penalty's aims of deterrence and retribution. By contrast, here, there is no indication that Allen's physical condition or his age has affected his mental acuity. To the contrary, Allen's mental state was last evaluated on December 27, 2005, and he was found competent. Indeed, he does not claim that he is mentally incompetent in any way. *Ford*, then, is inapposite because nothing in the record suggests that Allen's physical condition and age render him unable to comprehend the nature and purpose of the death penalty that he faces.

Nor has Allen argued that his current physical incapacity[9] somehow relates to his culpability at the time he committed the capital offenses. Allen was fifty years old when he orchestrated the murders of Bryon Schletewitz, Josephine Rocha, and Douglas White. His age and experience only sharpened his ability to coldly calculate the execution of the crime. Nothing about his current ailments reduces his culpability and thus they do not lessen the retributive or deterrent purposes of the death penalty.

Moreover, in both *Atkins* and *Roper* the Supreme Court looked to objective indicia of consensus — "the rejection of

---

[9]The Warden vigorously disputes the level of physical incapacitation Allen currently suffers, relying in part on the interview of Allen by one of Allen's experts, Dr. Paul Good.

the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice" — to provide sufficient evidence that society viewed juveniles and the mentally retarded as " 'categorically less culpable than the average criminal.' " *Roper*, 125 S. Ct. at 1194 (quoting *Atkins*, 536 U.S. at 316). As the Court noted in both *Atkins* and *Roper*, it is "not so much the number of these States that is significant, but the consistency of the direction of change." *Roper*, 125 S.Ct. at 1193 (quoting *Atkins*, 536 U.S. at 315). Allen's argument that sixteen states disallow the death penalty altogether is overly broad. We cannot equate contemporary judgment that the death penalty is generally inappropriate for all persons with the specific claim presented here. Allen's logic equally leads to the conclusion that the death penalty in general is contrary to evolving standards of decency, as to the conclusion that the death penalty as applied to elderly and infirm prisoners is contrary to the Eighth Amendment. This position is further weakened by the fact that, if sixteen states bar the death penalty, then thirty-four states must still permit the death penalty for elderly and infirm persons. Allen has not adduced any evidence showing that states are barring executions specifically of the elderly or infirm.

Allen also argues that there is a *de facto* practice on the part of states not to execute elderly persons. He points out that since 1973, only two persons over the age of seventy have been executed — James Hubbard, who was seventy-four when executed by the State of Alabama in 2004, and John B. Nixon, who was seventy-seven when executed by the State of Mississippi in 2005. Allen also cites one study which asserts that only twenty-seven of the 7,311 people executed in the United States between 1608 and 2002 whose ages were ascertainable were over the age of seventy. Allen "infers" from the rarity of executions of elderly persons, as shown in the bare statistics he provides, that there is a pattern or practice, an evolving standard of decency, of not executing the elderly. Allen has not, however, adduced any direct evidence of a

societal aversion to executing the elderly, such as evidence demonstrating that juries disproportionately elect not to impose the death penalty for elderly offenders, or that governors are more likely to commute death sentences of older prisoners or that any State has legislated against the execution of the elderly and infirm.

It may very well be that other societal forces account for the paucity of elderly persons executed. It is possible that more elderly persons die on death row before their appeals are exhausted, given that the average time spent in prison for a death row inmate in 2004 was ten years and two months. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS BULLETIN, CAPITAL PUNISHMENT 2004, at 11. In addition, most people commit crimes while in their twenties. In 2004, the mean age at the time of arrest for a person later sentenced to death was twenty-eight years old; it is rare for anyone over fifty to be arrested for a crime that carries the death penalty. *Id.* at 7. Allen presents no contrary evidence to suggest that a significant number of people commit capital crimes at age fifty and above. The DOJ Report also belies the notion that there is any "evolving standard of decency" rejecting execution of the elderly — a ninety-year-old man sits on death row in Arizona, forty-four persons aged sixty-five or older are on death row, and eighty-two persons aged sixty to sixty-four are on death row across the nation. *Id.* at 7-8.

Thus, Allen's age and physical infirmity claim does not fit within the twin rationales motivating the Supreme Court's recent Eighth Amendment jurisprudence. The claim that the Eighth Amendment forbids the execution of the elderly and infirm finds no support in our existing law, that of our sister circuits, or of the Supreme Court. Therefore, Allen's claim is not "debatable among jurists of reason" such that another court could rule in a different manner, nor is it a question that is "adequate to deserve encouragement to proceed further." *Lambright*, 220 F.3d at 1025 (internal citations omitted), and should not be certified.

**[3]** Even were we to certify this claim, it would fail on the merits due to the standards of review applicable under AEDPA, because the California Supreme Court's denial of habeas relief was neither "contrary to, [nor] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The California Supreme Court denied Allen's petition "on the merits," without any discussion of Allen's claims or its reasoning. "We have relaxed AEDPA's strict standard of review when the state court reaches a decision on the merits but provides no reasoning to support its conclusion. Under such circumstances, we independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (citing *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law."). However, the independent review undertaken under *Delgado* is not the equivalent of *de novo* review, but rather is a style of review which views the state court decision "through the 'objectively reasonable' lens ground by *Williams*." *Delgado*, 223 F.3d at 982 (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). In addition, "although we independently review the record, we still defer to the state court's ultimate decision." *Pirtle*, 313 F.3d at 1167.

**[4]** Even applying this less deferential standard of review, we find no substantive support for Allen's legal position; he is asking us to make new law, which we cannot do. There is no clearly established federal law, as determined by the Supreme Court, to support Allen's age and physical disability based claim. The Supreme Court has adopted the definition of new law fashioned in *Teague v. Lane*, 489 U.S. 288 (1989), to determine what qualifies as clearly established law under

AEDPA. *See Williams* at 379 (Stevens, J., for four justices) ("The antiretroactivity rule recognized in *Teague*, which prohibits reliance on 'new rules,' is the functional equivalent of a statutory provision commanding exclusive reliance on 'clearly established law.' "). *Teague* counsels that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government," or, to put it differently, "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (emphasis in original). Notably, *Teague* offers the Court's decision in *Ford v. Wainwright*, 477 U.S. 399, 410 (1986), as an example of a case which broke new ground. *Id.* We fail to see how Allen's proposed restriction on capital punishment based upon his status as an elderly and infirm death row inmate would not qualify as breaking new ground or imposing a new obligation on the States or the Federal Government.

## III.

## THE *LACKEY* CLAIM

We must first determine whether Allen's claim that twenty-three years on death row under "horrific" conditions of confinement violates the Eighth Amendment is a "second or successive" habeas petition within the meaning of 28 U.S.C. § 2244.

[5] Title 28 U.S.C. § 2244 acts as a "gatekeeper" to prevent petitioners from filing "second or successive" habeas petitions in the district court without first moving "in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). Section 2244(b)(2) requires the court of appeals to dismiss the claims in a "second or successive" habeas petition unless:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to

cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

**[6]** AEDPA does not define the term "second or successive." However, "[t]he Supreme Court, the Ninth Circuit, and our sister circuits have interpreted the concept incorporated in this term of art as derivative of the 'abuse-of-the-writ' doctrine developed in pre-AEDPA cases." *Hill v. Alaska*, 297 F.3d 895, 897-98 (9th Cir. 2002). *See also Stewart v. Martinez-Villareal*, 523 U.S. 637, 642-43 (1998) (AEDPA's " 'restrictions on successive petitions constitute a modified res judicata rule, a restraint on what used to be called in habeas corpus practice "abuse of the writ." ' ") (quoting *Felker v. Turpin*, 518 U.S. 651, 664 (1996)); *Calderon v. United States Dist. Court*, 163 F.3d 530, 538 (9th Cir. 1998) (en banc) ("[a]buse of the writ evolved as a judicially created equitable doctrine, but it is now codified by the AEDPA" at § 2244(b)), *overruled in unrelated part by Woodford v. Garceau*, 538 U.S. 202 (2003); *Crouch v. Norris*, 251 F.3d 720, 723-25 (8th Cir. 2001) (applying abuse of the writ principles to assess prisoner's challenge to the execution of his sentence); *Muniz v. United States*, 236 F.3d 122, 127 (2d Cir. 2001) (per curiam) (defining second or successive "with reference to the equitable principles underlying the 'abuse of the writ' doctrine"); *United States v. Barrett*, 178 F.3d 34, 44 (1st Cir. 1999) ("The core of the AEDPA restrictions on second or successive § 2255 petitions is related to the longstanding judicial

and statutory restrictions embodied in the form of res judicata known as the 'abuse of the writ' doctrine."); *Reeves v. Little*, 120 F.3d 1136, 1139 (10th Cir. 1997) (per curiam) (noting that AEDPA restrictions on successive petitions stem from abuse of the writ doctrine). An "abuse of the writ" occurs when a petitioner raises a habeas claim that could have been raised in an earlier petition were it not for "inexcusable neglect." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991). "[T]he abuse-of-the-writ doctrine . . . concentrate[s] on a petitioner's acts to determine whether he has a legitimate excuse for failing to raise a claim at the appropriate time." *Id.* at 490. If the petitioner can show cause for his failure to raise the claim, he then must demonstrate " 'actual prejudice' resulting from the errors of which he complains." *Id.* at 494 (quoting *United States v. Frady*, 456 U.S. 152, 168 (1982)).

**[7]** Claims that suffering the ravages of death row for a lengthy duration violate the Eighth Amendment are commonly called *Lackey* claims, after Justice Stevens' concurrence in the Supreme Court's denial of certiorari in *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of certiorari). There, Justice Stevens pointed out that the Court's determination in *Gregg v. Georgia*, 428 U.S. 153 (1976), that the Eighth Amendment did not prohibit capital punishment relied heavily on the ground that the death penalty "might serve 'two principal social purposes: retribution and deterrence.' " *Lackey*, 514 U.S. at 1045 (quoting *Gregg*, 428 U.S. at 183). He questioned whether either of those policy grounds retained any force after an inmate had spent seventeen years on death row, noting that "the acceptable state interest in retribution has arguably been satisfied by the severe punishment already inflicted," *id.*, and that "the additional deterrent effect from an actual execution now . . . seems minimal," *id.* at 1046. Since then, Justice Breyer has also questioned whether the additional punishment of death after confinement on death row for "more than a generation" was cruel and unusual punishment. *Foster v. Florida*, 537 U.S. 990, 993 (2002) (Breyer, J., dissenting from denial of certiorari) (arguing that imposi-

tion of the death penalty might violate the Eighth Amendment where Florida courts twice vacated petitioner's sentence and the Eleventh Circuit held that his sentence was unconstitutional, but then four months later withdrew all relief); *Knight v. Florida*, 528 U.S. 990, 993-94 (1999) (Breyer, J., dissenting from denial of certiorari) (arguing that imposition of the death penalty might violate the Eighth Amendment where petitioner had been on death row for twenty-four years and the Eleventh Circuit found that Florida's death penalty sentencing procedure was constitutionally defective, but the State waited more than seven years before holding a new sentencing hearing); *Elledge v. Florida*, 525 U.S. 944, 945 (1998) (Breyer, J., dissenting from denial of certiorari) ("Not only has he, in prison, faced the threat of death for nearly a generation, but he has experienced that delay because of the State's own faulty procedures . . . .").[10] Allen claims that, enduring this death row phenomenon, his punishment has been made all the more acute by the horrific conditions and unconstitutional, substandard medical care provided at San Quentin.

**[8]** Allen brings his *Lackey* claim for the first time in this second habeas petition. A petition for review of a new claim that could have been raised earlier may be treated as the functional equivalent of a second or successive petition for a writ of habeas corpus. *See Thompson v. Calderon*, 151 F.3d 918, 921 (9th Cir. 1998) (en banc) ("In most cases when the factual predicate for a Rule 60(b) motion also states a claim for a successive petition under 28 U.S.C. § 2244(b), . . . the Rule 60(b) motion should be treated as a successive habeas petition."); *Felker*, 101 F.3d at 661 ("Rule 60(b) cannot be used to circumvent restraints on successive habeas petitions.").

**[9]** Allen could have brought his *Lackey* claim in his first habeas petition in 1988, when he had already been on death

[10]In all three cases, however, much of the delay had been due to the State's own errors, a situation not present here, as the courts on both direct and habeas appeal have uniformly rejected each of Allen's claims.

row for six years, in his first amended habeas petition, when he had been on death row for nine years, or at some other point during the course of the proceedings on his first habeas petition in federal court from 1993 to 2005. Allen cites the Supreme Court case *Stewart v. Martinez-Villareal*, to bolster his argument that his *Lackey* claim could not have been brought earlier because it was not ripe. 523 U.S. at 642-43. *Martinez-Villareal* is distinguishable, however, because it dealt with a *Ford* claim of mental incompetency. *See id.* at 640; *Ford*, 477 U.S. at 410 (holding that "the Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane"). Unlike a *Ford* claim of incompetence, a *Lackey* claim does not become ripe only after a certain number of years or as the final hour of execution nears. There is no fluctuation or rapid change at the heart of a *Lackey* claim, but rather just the steady and predictable passage of time. As the district court noted, that the passage of time makes his *Lackey* claim stronger is irrelevant to ripeness, because the passage of time strengthens any *Lackey* claim. Allen's initial execution date was in 1988, and by the time habeas proceedings resumed in federal court in 1993, he already had been suffering the psychological distress of death row and impending execution for eleven years. Those proceedings did not end until 2005. Allen could have sought to amend his petition to state a *Lackey* claim at any time during their pendency. Allen fails to show adequate cause as to why he delayed raising his *Lackey* claim.

[10] We conclude that because Allen could have brought his *Lackey* claim earlier, it is a "second or successive" habeas application under the abuse of the writ doctrine and is governed by section 2244. *See Ortiz v. Stewart*, 149 F.3d 923, 944 (9th Cir. 1998) (holding that a *Lackey* claim, not raised in a first § 2254 petition, does not fall within either exception to AEDPA's bar against subsequent claims), *cert. denied*, 526 U.S. 1123 (1999); *Gerlaugh v. Stewart*, 167 F.3d 1222, 1223-24 (9th Cir. 1999) (same); *Ceja v. Stewart*, 134 F.3d 1368, 1369 (9th Cir. 1998) (affirming district court's denial of "sec-

ond or successive" petition based on failure to obtain permission to file from the Ninth Circuit because no Supreme Court or Ninth Circuit authority recognizes a *Lackey* claim as an exception to AEDPA). It is undisputed that Allen did not seek our permission to file his *Lackey* claim in the district court. Therefore, the district court correctly dismissed this claim pursuant to 28 U.S.C. § 2244(b)(3)(A).

Allen now seeks permission to file his *Lackey* claim as a "second or successive" habeas petition. We deny this request because Allen has not made a prima facie case that he has satisfied the requirements of section 2244. 28 U.S.C. § 2244(b)(3)(C).

**[11]** Even were we to find that Allen's *Lackey* claim was not a "second or successive" habeas petition and reach the merits of his claim, we would necessarily conclude that the California Supreme Court's denial of habeas relief was not "contrary to," and did not involve "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**[12]** The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment. Justices Stevens and Breyer have argued that this claim should be heard by the Court, as discussed above, in response to the Court's denial of certiorari in several death penalty cases where an inmate has served a lengthy period of time on death row. *See Foster*, 537 U.S. at 991-93 (Breyer, J., dissenting from denial of certiorari); *Knight*, 528 U.S. at 993 (Breyer, J., dissenting from denial of certiorari); *Elledge*, 525 U.S. at 944-46 (Breyer, J., dissenting from denial of certiorari); *Lackey*, 514 U.S. 1045-47 (Stevens, J., respecting denial of certiorari). However, Justice Thomas, concurring in *Knight*, noted that he is "unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain

when his execution is delayed." 528 U.S. at 990 (Thomas, J., concurring). Allen cannot credibly claim that there is any clearly established law, as determined by the Supreme Court, which would support his *Lackey* claim.

**[13]** Allen also cannot credibly argue that "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality opinion), as evidenced by the decisions of state and federal courts, are moving toward recognition of the validity of *Lackey* claims. *See, e.g., Roper v. Simmons*, 125 S.Ct. at 1192-1194 (surveying state prohibitions on the death penalty for juveniles and finding that the "consistency of direction of change has been demonstrated" as to justify a constitutional prohibition). Indeed, we denied outright a *Lackey* claim in *McKenzie v. Day*, holding that "[w]e cannot conclude that delays caused by satisfying the Eighth Amendment themselves violate it." 57 F.3d 1461, 1467 (9th Cir.), *opinion aff'd and adopted*, 57 F.3d 1493 (9th Cir. 1995) (en banc). We further reasoned that "[i]t would indeed be a mockery of justice if the delay incurred during the prosecution of claims that fail on the merits could itself accrue into a substantive claim to the very relief that had been sought and properly denied in the first place." *Id.* at 1466.

Numerous other federal and state courts have rejected *Lackey* claims. *See Chambers v. Bowersox,* 157 F.3d 560, 568, 570 (8th Cir. 1998) (holding that *Lackey* claim is procedurally barred by failure to raise in state courts; but nonetheless noting that death row delays do not constitute cruel and unusual punishment because delay results from "desire of our courts, state and federal, to get it right, to explore . . . any argument that might save someone's life"); *White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996) ("The state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards. . . . White has benefitted from this careful and meticulous process and cannot

now complain that the expensive and laborious process of habeas corpus appeals which exists to protect him has violated other of his rights."); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir.) *cert. denied*, 515 U.S. 1173 (1995) (noting that to date, no federal court had recognized claim); *Fearance v. Scott*, 56 F.3d 633, 639 (5th Cir. 1995) ("Fearance was not the unwilling victim of a *Bleak House*-like procedural system hopelessly bogged down; at every turn, he, without complaining about the accumulating period on death row, sought extensions of time, hearings and reconsiderations."); *Free v. Peters*, 50 F.3d 1362, 1362 (7th Cir. 1995) (per curiam) (any inordinate delay in execution of defendant's death sentence was directly attributable to his own conduct and thus did not constitute cruel and unusual punishment); *Williams v. Anderson*, 174 F. Supp. 2d 843, 874-75 (N.D. Ind. 2001), *aff'd sub nom.*, *Williams v. Davis*, 301 F.3d 625 (7th Cir. 2002); *Ex Parte Bush*, 695 So. 2d 138, 139-140 (Ala. 1997); *State v. Schackart*, 947 P.2d 315, 336 (Ariz. 1997); *Hill v. State*, 962 S.W.2d 762, 767 (Ark. 1998) (holding that it was not cruel and unusual punishment to resentence the defendant to death even though he had been on death row for more than fifteen years); *People v. Massie*, 19 Cal. 4th 550, 574 (1998); *People v. Frye*, 18 Cal. 4th 894, 1029-31 (1998); *People v. Hill*, 3 Cal. 4th 959, 1014-16 (1992), *overruled on other grounds by Price v. Superior Court*, 25 Cal. 4th 1046 (2001); *Parker v. State*, 873 So. 2d 270, 294 (Fla. 2004), *cert. denied*, 125 S. Ct. 868 (2005) (concluding that an eighteen-year span between indictment for capital murder and resentencing to death was not cruel and unusual punishment); *Booker v. State*, 773 So. 2d 1079, 1096 (Fla. 2000) (per curiam); *McKinney v. State*, 992 P.2d 144, 150-52 (Idaho 1999); *State v. Smith*, 931 P.2d 1272, 1287-89 (Mont. 1996); *Bell v. State*, 938 S.W.2d 35, 53 (Tex. Crim. App. 1996). Allen's *Lackey* claim is devoid of support in federal or state law and therefore the denial of habeas relief by the California Supreme Court, even without a thorough discussion of the merits, could not possibly be construed to be "contrary to, or involve[ ] an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## IV.

## CONSTITUTIONAL CHALLENGE TO 28 U.S.C. § 2254(d)

Allen for the first time on appeal challenges the constitutionality of AEDPA's standards for federal court habeas review of State court judgments, arguing that 28 U.S.C. § 2254(d) violates the Supremacy Clause, Article III's case or controversy requirement, and the principle of separation of powers. Allen offers no adequate explanation for his failure to raise his section 2254(d)(1) challenge in the district court; in so doing, he deprived the district court of an opportunity to address the merits of his claim. "[A] party cannot treat the district court as a mere ill-placed bunker to be circumvented on his way to this court where he will actually engage his opponents." *Handa v. Clark*, 401 F.3d 1129, 1132 (9th Cir. 2005) (citing *Crawford v. Lungren*, 96 F.3d 380, 389 n.6 (9th Cir. 1996)).

**[14]** Allen concedes that he failed to properly proceed with this claim, but relies on our principle that "[w]hile issues not raised to the district court normally are deemed waived, we have recognized three narrow exceptions to this general rule." *United States v. Flores-Montano*, 424 F.3d 1044, 1047 (9th Cir. 2005). We may exercise discretion to review newly presented issues if: "(1) there are exceptional circumstances why the issue was not raised in the trial court; (2) the new issue arises while the appeal is pending because of a change in the law; or (3) the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court. *Id*. (internal quotations omitted). "Further exception may be made when plain error

has occurred and an injustice might otherwise result." *Id.* (internal quotations omitted).

**[15]** Allen does not satisfy any of these exceptions. First, Allen failed to present any exceptional circumstances satisfactorily explaining why he did not raise the issue in the district court. Second, AEDPA's constitutionality is not a new issue; Allen and his attorneys have known since April 24, 1996, the date AEDPA was enacted, that any subsequent petition Allen filed would be governed by AEDPA's provisions, including section 2254(d)(1). Third, although the constitutionality of section 2254(d)(1) is purely a question of law, the prejudice to the State when a petitioner brings this claim on the eve of his execution is great. When a petitioner seeks an equitable remedy, the federal courts "must take into consideration the State's strong interest in proceeding with its judgment and [the petitioner's] obvious attempt at manipulation." *Gomez v. United States Dist. Court*, 503 U.S. 653, 654 (1992) ("This claim could have been brought more than a decade ago. There is no good reason for this abusive delay . . . . A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief."). In addition, a finding of waiver is particularly appropriate here where, in his district court filing, Allen discussed AEDPA's standards of review, argued the merits of his claim with respect to AEDPA, and specifically invoked the wording of the AEDPA deference standard.

**[16]** Moreover, by including this claim for the first time in his motion before us for a certificate of appealability, Allen violates both Ninth Circuit Rule 22-1 and Federal Rule of Appellate Procedure 22(b)(1). 9TH CIR. R. 22-1(a)( "The court of appeals will not act on a motion for a COA if the district court has not ruled first."); FED. R. APP. P. 22(b)(1) ("If an applicant files a notice of appeal, the district judge who rendered the judgment must either issue a certificate of appealability or state why a certificate should not issue."). Given Allen's failure to raise his constitutional challenge to AEDPA

in a timely and proper manner, we decline Allen's invitation to address this momentous issue at this stage of the proceedings.[11]

# V.

## CONCLUSION

[17] Based on the foregoing, we deny Allen's motions for leave to file a second or successive habeas petition and certification of appealability. Our discussion of the issues presented by this appeal also reveals that Allen has not demonstrated "the presence of substantial grounds upon which relief might be granted." *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983); *Greenawalt v. Stewart*, 105 F.3d 1268, 1277 (9th Cir. 1997), *abrogation on other grounds recognized by Jackson v. Roe*, 425 F.3d 654, 658-61 (9th Cir. 2005) (discussing impact of Supreme Court's decision in *Rhines v. Weber*, 125 S. Ct. 1528 (2005)). Accordingly, we also deny Allen's emergency motion for a stay of execution.

## JUDGMENT OF THE DISTRICT COURT

---

[11]We note that we have previously rejected the claim that AEDPA violates Article III. *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 & n.5 (9th Cir. 2000). Like Allen, Duhaime argued that section 2254(d)(1) violates Article III because the lower federal courts have a constitutional duty to " 'say what the law is.' " *Duhaime*, 200 F.3d at 600-01 & n.5 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803)). The *Duhaime* court acknowledged that prior Ninth Circuit cases had not addressed petitioner's exact arguments, but *Duhaime* concluded that the circuit's prior cases had "implicitly" rejected the argument that section 2254(d)(1) was unconstitutional under Article III. *See id.* at 601. "Section 2254(d) merely limits the source of clearly established law that the Article III court may consider, and that limitation serves to govern prospectively classes of habeas cases rather than offend the court's authority to interpret the governing law and to determine the outcome in any pending case." *Id.* In any event, regardless of AEDPA's constitutionality, as our foregoing analysis explains, Allen's Eighth Amendment claims find no support in the law.

**AFFIRMED; MOTION FOR CERTIFICATION OF APPEALABILITY DENIED; MOTION FOR AUTHORIZATION OF A SECOND OR SUCCESSIVE APPLICATION DENIED; MOTION FOR STAY OF EXECUTION DENIED.**